RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0375P (6th Cir.)
File Name: 02a0375p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

*v.*

No. 00-2103

WILLIAM LUKE CARNES,
*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 97-80053—Gerald E. Rosen, District Judge.

Argued: June 14, 2002

Decided and Filed: October 29, 2002

Before: MARTIN, Chief Circuit Judge; KEITH and
KENNEDY, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Jeffrey M. Brandt, ROBINSON BRANDT LAW
OFFICES, Cincinnati, Ohio, for Appellant. Jennifer J.
Peregord, ASSISTANT UNITED STATES ATTORNEY,
Detroit, Michigan, for Appellee. **ON BRIEF:** Jeffrey M.
Brandt, ROBINSON BRANDT LAW OFFICES, Cincinnati,
Ohio, for Appellant. Jennifer J. Peregord, ASSISTANT

UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.

KENNEDY, J., announced the judgment of the court and delivered an opinion, in which MARTIN, C. J. and KEITH, J., concurred except as to Part VIII.  KEITH, J. (pp. 12-21), delivered a separate opinion, in which MARTIN, C. J., concurred, which constitutes the opinion of the court on the issue addressed in Part VIII.  KENNEDY, J. (pp. 22-25), delivered a separate dissenting opinion with respect to Part VIII.

─────────────

**OPINION**

─────────────

KENNEDY, Circuit Judge.   Defendant William Luke Carnes appeals his conviction and sentence for possession of a firearm and ammunition by a felon, witness tampering, and illegally intercepting wire communications.  Parole officers and officers from the Auburn Hills, Michigan police department executed an arrest warrant against Carnes on January 14, 1997, at a residence belonging to Lisa Kellum, Carnes's then-girlfriend.  After arresting Carnes, the officers conducted a warrantless search of the residence, suspecting that he was violating the terms of his parole by living in a location other than that specified in his conditions of parole and possibly committing additional crimes.  During the search, the officers discovered cassette tapes, a handgun, and ammunition.  The tapes later proved to be recordings of telephone conversations obtained through a wiretap illegally placed on Kellum's phone line.

Carnes was indicted initially for a single charge of possession of a firearm by a felon.  He filed a motion to suppress the firearm, which was denied.  A superseding indictment added the charges of possession of ammunition by a felon, witness tampering, and illegally intercepting phone calls.  Carnes later moved to dismiss the indictment for violations of the Speedy Trial Act, and the district court

granted that motion without prejudice. A grand jury returned a second superseding indictment restating the charges, and Carnes was subsequently convicted by a jury on all four counts. In this appeal, Carnes argues the district court erred by: denying his motion for a dismissal for lack of jurisdiction; failing to consider two prior offenses as one conviction for sentencing purposes; considering his three prior violent felonies in sentencing when they were not alleged in the indictment or proved; dismissing the superseding indictment *without* prejudice, and; failing to suppress certain evidence. Additionally, Carnes challenges the sufficiency of the evidence as to the witness tampering count.

For the reasons explained in Judge Keith's opinion with respect to Part VIII, we reverse Carnes's conviction for illegal interception of a wire communication and remand that count for a new trial. However, for the reasons explained in Parts I-VII, we affirm the other convictions, finding any error as to those harmless.

I. Constitutionality of the Federal Felon-in-Possession and Wiretapping Provisions

Carnes's first argument is that the district court erred in denying his motion to dismiss based on the unconstitutionality of the federal wiretapping and felon-in-possession provisions. We review a motion challenging the constitutionality of a federal statute *de novo*. *United States v. Smith*, 182 F.3d 452 (6th Cir. 1999). Carnes asserts that his activities did not involve interstate commerce, and that under *United States v. Morrison*, 529 U.S. 598 (2000), the federal felon-in-possession of a firearm and wiretapping statutes, 18 U.S.C. §§ 922(g)(1) and 2511(1), respectively, are constitutionally defective.

The Supreme Court, prior to *Morrison*, held that the felon-in-possession statute was a valid exercise of Congress's power to regulate interstate commerce. *Scarborough v. United* States, 431 U.S. 563 (1977). The Third, Eighth, and Tenth Circuits recently have addressed the effect of *Morrison* on § 922(g)(1) and concluded that the argument identical to

the one advanced by Carnes is without merit. *United States v. Shepherd*, 2002 WL 471741 (8th Cir. 2002); *United States v. Singletary*, 268 F.3d 196 (3rd Cir. 2001); *United States v. Dorris*, 236 F.3d 582 (10th Cir. 2000). For the reasons set forth in those opinions, we find Carnes's position unpersuasive. *Dorris* points out that "Section 922(g)(1) by its language only regulates those weapons affecting interstate commerce by being the subject of interstate trade. It addresses items sent in interstate commerce, and the channels of commerce themselves--ordering that they be kept clear of firearms. Thus, no analysis of the style of . . . *Morrison* is appropriate." 236 F.3d at 586. The felon-in-possession statute survives *Morrison*.

Carnes frames his argument as a facial challenge, but an as-applied challenge would be equally unpersuasive, since the weapon and ammunition in question were manufactured outside of the state of Michigan.

Similarly, *Morrison* does not affect the validity of the wiretapping statute. The wiretapping statute, as the district court pointed out, has a substantial relationship to interstate commerce since "telecommunications are both channels and instrumentalities of interstate commerce." *United States v. Carnes*, 113 F.Supp.2d at 1150 (citing *Spetalieri v. Kavanaugh*, 36 F.Supp.2d 92, 115-16 (N.D.N.Y. 1998)).

II.   Sentencing as an Armed Career Criminal

Carnes next argues that the district court erred by sentencing him under the Armed Career Criminal Act, 18 U.S.C. § 924(e)(1) ("ACCA"), which triggered a 15-year mandatory minimum sentence. Section 924(e)(1) imposes a fifteen-year minimum for felons in possession of firearms who have "three previous convictions by any court . . . for a violent felony or a serious drug offense . . . committed on occasions different from one another." Carnes was previously convicted for breaking and entering in connection with an incident in 1983 and for burglarizing two adjacent homes in Troy, Michigan, in 1991. Prosecutors charged two separate offenses in connection with the 1991 burglaries, and Carnes

protections accorded to parolees, I agree with the district court's ultimate conclusion that both seizing and listening to the tapes were reasonable in light of the totality of the circumstances.

parole conditions," then seizing those cassettes (without a warrant) would be appropriate.

The majority correctly points out, however, that the government is required to demonstrate reasonable suspicion not only to seize the tapes, but also to listen to them. *See United States v. Johnson*, 994 F.2d 980 (2d Cir. 1993), *cert. denied*, 510 U.S. 959 (1993) (requiring independent probable cause to listen to properly seized audio tapes). The tapes were listened to "sometime after" -- perhaps several months after -- their seizure on January 14, 1997. The listener was the Assistant United States Attorney prosecuting the weapons charges, not a parole officer. There are no objective indicia that the tapes were listened to for the purpose of establishing a violation of the residency condition of Carnes's parole; indeed, what little objective indicia there are suggests that this was not the intended purpose.[3]

Nonetheless, the reviewing officers had reasonable suspicion to believe that the tapes would tie Carnes to the room in which the tapes were found. The government points out that tying Carnes to that room was important to establish that the gun and ammunition, also found in that room, belonged to Carnes as well. The search, therefore, was supported by reasonable suspicion that evidence relating to a criminal act would be uncovered. Under *Knights*, there is no longer a requirement that the object of the search relate exclusively to a parole violation.[4] *Knights*, 122 S.Ct. at 593. Therefore, in light of the lessened Fourth Amendment

---

[3] The United States suggested at oral argument that the tapes were listened to perhaps three months after they were initially seized, some time after Carnes had already been convicted of violating the his parole conditions. The tapes were in the custody of federal agents prosecuting Carnes for felon-in-possession crimes and not parole violations.

[4] Nonetheless, the search fell within the scope of searches authorized by Carnes's parole conditions, since the express terms of his parole instructed him not to "own or possess a weapon of any type or . . . ammunition," and not to "engage in behavior that constitutes a violation of any criminal law of any unit of government."

---

pled guilty to both. In this appeal, as in the court below, Carnes argues that these two burglaries were not "committed on occasions different from one another" and thus should not count as two prior convictions for the sake of the ACCA.

The district court found this question to be a close one, but concluded that the offenses should count as separate occasions. The court below considered our somewhat inconclusive case law on the question of what constitutes an "occasion." In *United States v. Brady*, 988 F.2d 664 (6th Cir. 1993), defendant Brady committed one armed robbery at a beauty shop, and then, less than an hour later, committed a second robbery at a nearby bar. We held *en banc* that two prior robbery convictions counted as separate criminal episodes, opining that:

> offenses committed by a defendant at different times and places and against different victims, although committed within less than an hour of each other, are separate and distinct criminal episodes and that convictions for those crimes should be counted as separate predicate convictions . . . . [W]hile defendant Brady sat at the . . . Bar with his concealed shotgun, he could have decided that one robbery he had committed was enough for the evening. Instead, he decided to rob again . . . .

988 F.2d at 669-70.

In *United States v. Wilson*, 27 F.3d 1126, 1131 (6th Cir. 1994), we applied *Brady* to a case where a defendant committed illegal sexual conduct against separate victims on separate floors of the same building, finding that defendant "could have halted his criminal rampage at any time" but instead "chose to continue selecting different victims in separate places." *Id.* We found *Brady* controlling and considered the offenses to be distinct for ACCA purposes.

We have reached seemingly inconsistent results in other cases. In *United States v. Graves*, 60 F.3d 1183 (6th Cir. 1995), a defendant committed a burglary and then assaulted a police officer. We found that because the defendant "had

not yet left the location of the burglary" when he committed the assault, the assault and the burglary should not be considered to have occurred on separate occasions. In *United States v. Murphy*, 107 F.3d 1199 (6th Cir. 1997), a defendant committed an armed robbery in one residence of a duplex, and stayed behind to prevent that unit's occupant from calling the police while the defendant's accomplices robbed the other unit of the duplex. Because the defendant had not left the first residence and was only guilty of aiding and abetting as to the robbery of the second residence, we concluded that he had not successfully completed the first robbery, and that there was no "definable endpoint" to the first event. 107 F.3d at 1210. Then, in *United States v. Thomas*, 211 F.3d 316 (6th Cir. 2000), we found that a defendant's rapes of two women (which occurred during a period in which defendant and his accomplice maintained control over both women) did not constitute distinct offenses because of the "absence of a completion or definable endpoint." *Id.* at 321. In *Thomas*, we reached that conclusion in spite of the fact that the rapes of the two women occurred in separate locations (the defendant forced the women to drive him from one location to the other between rapes).

Carnes argues that, in regards to his prior convictions, it would be difficult to distinguish between the end of the first burglary and the beginning of the second. The obvious way to distinguish between these two robberies is that Carnes had to leave one residence in order to burglarize the second. Indeed, he was only caught because the resident of the first home discovered he had been burglarized and called out while Carnes was still in the second home (the occupant of the second home was asleep). Had Carnes left after committing just one robbery, he would have likely gotten away. Thus, unlike in *Murphy* or *Thomas*, it is possible to identify an endpoint between the two offenses. Neither does *Graves* control this case because the robberies were committed in distinct locations (two separate residences). We therefore affirm the district court's conclusion that Carnes was validly sentenced under the ACCA.

here. When an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable." *Id.* at 592-93.[1]

As in the *Knights* case, Carnes was subject to a search condition. Michigan law provides, in relevant part, that a parole agent may conduct a warrantless search of a parolee's person and property in conjunction with a lawful arrest or when there is "reasonable cause to believe that a violation of parole exists." Mich. Admin. Code § R 791.7735.[2] I agree with the district judge that such conditions existed during the arrest of Carnes and the search of his belongings because the tapes were seized in a briefcase containing papers that provided evidence that Carnes was not living in the location specified by the conditions of his parole. The tapes could have had his voice on them, and if so would have tied him to the location from which they were seized. The district court held that where a parole officer could reasonably suspect that cassettes found during a search "might constitute evidence that Defendant was living at an address in violation of his

---

[1] Unlike the majority, I do not think the Supreme Court's articulation of a "less than probable cause standard" is limited to the specific facts of Knights's case. The Court was describing the statistical evidence demonstrating recidivism among parolees and probationers as a class, not Knights as an individual. Although the question of whether there exists reasonable suspicion remains a case-by-case, totality of the circumstances analysis, I read *Knights* as creating a categorical rule that searches of parolees and probationers subject to search conditions require reasonable suspicion of the commission of a crime or parole violation, not probable cause.

[2] This valid state regulation was a condition on Carnes's liberty and privacy interests in as much as it subjected him to searches based only on reasonable cause, rather than probable cause, and dispensed with the warrant requirement. I do not agree with Judge Keith that there is a significant distinction between this and the search condition as read by the Supreme Court in *Knights* that would distinguish this case from *Knights*.

———————

## DISSENT

———————

KENNEDY, Circuit Judge, dissenting with respect to Part VIII.

I agree with Judge Keith's majority opinion on this issue that Carnes has standing to challenge the search of the tapes seized in his briefcase during the warrantless search. I also agree that the authorities needed Fourth Amendment justification both to seize and to listen to the tapes found at Lisa Kellum's residence. However, I would hold that reasonable suspicion of the commission of a crime or parole violation satisfies the Fourth Amendment when a parolee is subject to a search condition, and furthermore that reasonable suspicion was present in this case.

The Supreme Court has held that the expectation of privacy of a parolee is far more limited than that of ordinary citizens. The special needs of the parole system justify warrantless searches pursuant to reasonable state regulations. Parolees' residences and property may be searched without warrants when, under the totality of the circumstances, government agents possess reasonable suspicion that the parolee is in violation of a condition of his parole. *Griffin v. Wisconsin*, 483 U.S. 868 (1987). The Supreme Court's recent decision in *United States v. Knights*, 122 S.Ct. 587 (2001), augmented *Griffin* by establishing that warrantless searches of probationers' residences and property are permissible when supported by reasonable suspicion and authorized by a condition of probation, even when the object of the search is investigatory, rather than probationary. The Court noted that a reduction in certain liberties is "inherent in the very nature of" probation and parole, and the state has an important interest in focusing on probationers and parolees because of the high probability of recidivism as a class. *Id.* at 591-92. As a consequence, "the balance of governmental and private interests . . . warrant a lesser than probable cause standard

III.    *Apprendi* Argument

Carnes next argues that the three prior violent felony convictions constitute elements of the offense that, under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), must be alleged and proven in an indictment. This argument has no merit, as we have made clear that prior convictions are sentencing factors and need not be alleged in an indictment or proven beyond a reasonable doubt. *See United States v. Gatewood*, 230 F.3d 186, 192 (6th Cir. 2000); *United States v. King*, 272 F.3d 366, 375 n.4 (6th Cir. 2001). Carnes urges us to recognize that *Almendarez-Torres v. United States*, 523 U.S. 224 (1998), which held that prior convictions are sentencing factors, "will be short lived," Br. at 23, because of a realignment of the members Supreme Court. As we recently noted, we will wait for the Supreme Court to overrule its earlier decisions, and not anticipate future decisions. *United States v. Matthews*, 278 F.3d 560, 563 (6th Cir. 2002).

IV.    Sufficiency of the Evidence as to Witness Tampering

The evidence against Carnes on the witness tampering count is reviewed only for a "manifest miscarriage of justice" because of his failure to make a motion for judgment notwithstanding the verdict pursuant to Fed. R. Crim. Pro. 29. *See United States v. Abdullah*, 162 F.3d 897, 903 (6th Cir. 1998). Under this standard, we only reverse a conviction if the record is "devoid of evidence pointing to guilt." *Id.*

Lisa Kellum, Carnes's then-girlfriend, testified that Carnes encouraged her to lie by stating that the gun found in the course of Carnes's arrest belonged to her. Kellum told an investigator the gun was hers, and signed a written statement to that effect, but later recanted.

Carnes argues that there is no evidence that he "knowingly use[d] intimidation or physical force, threaten[ed] or corruptly persuade[d] another person" for the sake of influencing testimony in an official proceeding as required for conviction under 18 U.S.C. § 1512(b)(1). Carnes suggests that at worst, the record established he "encourage[d]" a lie.

It is true that Kellum did not testify that Carnes attempted to threaten or intimidate her in the specific context of his request that she lie about the gun. The prosecutor played the illegally intercepted tapes of Kellum's phone line, which provided evidence that on a number of occasions (prior to Carnes's asking her to lie) Carnes threatened Kellum. In other cases cited by the government, courts have upheld convictions for witness tampering even in the absence of directly threatening language when the court found the evidence could have been interpreted as threatening in "nature or intent." *United States v. Elwell*, 984 F.2d 1289, 1293-94 (1st Cir. 1993). The tapes introduced as evidence at trial demonstrate that Carnes had a long-standing pattern of threatening and abusive behavior toward Kellum. Like the less-than-direct language found to be threatening in *Elwell*, otherwise "encouraging" language can become a threat in nature or intent when issued by a long-time abuser. As a result, the record is not devoid of evidence of guilt and the conviction is affirmed.

## V. Dismissal of First Superceding Indictment Without Prejudice

The district judge dismissed the first superceding indictment without prejudice in August, 1998, due to violations of the Speedy Trial Act, 18 U.S.C. § 3162. In this appeal, Carnes argues that the district court erred by not dismissing the indictment *with* prejudice. We review claims that the a lower court should have dismissed with prejudice under a "modified" abuse of discretion standard. *United States v. Howard*, 218 F.3d 556, 560 (6th Cir. 2000). A district court's determination will not be "lightly disturbed." *United States v. Pierce*, 17 F.3d 146, 148 (6th Cir. 1994). To demonstrate that he was prejudiced by the delay, Carnes points to the death of a woman he had listed as a "potential witness" and the fact that he has "lost contact" with a second witness.

The district court carefully reviewed the factors the statute mandates it consider: the seriousness of the offense, the facts

### G.

The six audio tapes found at 1731 Harmon Street on January 14, 1997 were seized and, three months later, listened to by police in violation of the Fourth Amendment's prohibition of unreasonable searches and seizures. The district court erred in denying Carnes's motion to suppress the tapes, and this error resulted in Carnes's conviction for illegal interception of a wire communication. Accordingly, we REVERSE the conviction for illegal interception of a wire communication and REMAND that count for a new trial.

found, which in turn would tie Carnes to ownership of these items. However, there were far more direct links tying Carnes to the residence, the gun, and the ammunition – for example, his parole papers, prescription medication, utility bills, his own admission to having been at 1731 Harmon, and police surveillance.

Similarly, apart from the six tapes seized at 1731 Harmon, there is enough evidence to sustain the witness tampering conviction. First, there was the seventh tape, found under Kellum's home. Second, there was Kellum's testimony as to Carnes's repeated threats, including an incident when she visited him in jail and Carnes drew a picture of a gun in an attempt to convince her to claim ownership of the gun. This allegation was corroborated by a police search of Carnes's jail cell that produced the drawing. Other properly admitted evidence establishing this conviction included threatening voice mail messages, which were essentially duplicated by the six tapes seized at 1731 Harmon.

Without these six tapes, however, there was no evidence establishing Carnes as the person who planted the tape recorder under Kellum's house. The prosecutor explained his theory to the jury during closing:

> There's really only two dots to connect to prove that the defendant illegally tapes her calls. One is that the tapes are from calls in her house[,] the recorder was under her trailer.

> The second is, that those tapes of her personal calls, ended up in his briefcase in his room.

(Trial Transcript, July 1, 1999 at 69). Without the tapes from 1731 Harmon, there was no evidence to "connect the dots." We therefore find that as to the conviction for illegal interception of a wire communication, the error was not harmless.

and circumstances of the case which led to the dismissal, and the impact of reprosecution on the administration of the Speedy Trial Act and on the administration of justice. 18 U.S.C. § 3162(a)(2). The district court considered possession of a firearm by a felon and witness tampering to be serious offenses, and we agree. As to the facts and circumstances which led to the delay, the district court noted that the trial was only delayed for eight days beyond the statutory maximum of 70 days, and that there was no evidence that the government effectuated the delay. As to the effects of reprosecution on the administration of justice, the district court notes that Carnes offered no evidence that Ruth Baker died during the period of the eight-day delay or that contact with Carr was lost during that eight-day period. Moreover, Carnes had not hired an investigator to locate Carr. Thus, the court concluded that there was no nexus between the eight-day delay and the unavailability of either witness.

We conclude that the district court did not abuse its discretion in applying the statutory factors to the facts of this case.

## VI. Denial of Motion for Severance

Carnes moved to sever counts three (interception of wire communications) and four (witness tampering) from the firearm and ammunition charges. The district court denied the motion. We review the denial of a motion for severance under an abuse of discretion standard. *United States v. Rox*, 692 F.2d 453, 454 (6th Cir. 1982).

Carnes argues that the district court abused its discretion in concluding that these offenses were factually related. Under Fed. R. Crim. Pro. 8(a), district courts are encouraged to permit joinder if two offenses are "of the same or similar character or are based on the same act or transaction or on two or more acts or transactions." Joinder is proper where two crimes--and their proof--are intertwined. *United States v. Jacobs*, 244 F.3d 503 (6th Cir. 2001).

We have no doubt that the witness tampering count--based on Carnes's attempt to get Lisa Kellum to claim ownership of the gun that constituted the basis for the felon-in-possession charge--is intertwined with counts one and two (the weapon and ammunition possession charges).

However, count three (wiretapping) is not based on a common scheme or plan. The district judge held that it was connected to the other counts because the evidence was obtained in the same search, and because, like the witness intimidation charges, the wiretapping charge requires proof of the relationship between Carnes and Kellum. In a footnote, the district court added that the government intended to introduce the illegally intercepted tapes to provide evidence to support its witness intimidation charge. To allow a connection to be based upon the fact that evidence of multiple, unrelated crimes was obtained during the same search would do away with the requirement that the acts be of "similar character." That all of the crimes somehow involve a connection between the defendant and Kellum (the gun and ammunition were found in a residence she owned), is again too generous a standard. Carnes wiretapped Kellum's phone prior to knowing he was going to be charged as a felon-in-possession, so the wiretap cannot be considered part of a common plan to intimidate a witness not to testify with respect to that charge.

While we conclude the district court erred in not severing the counts, that error was harmless. *United States v. Lane*, 474 U.S. 438, 449 (1986). The evidence against Carnes on the wiretapping count was unambiguous and overwhelming, and even had he been tried for that charge separately, we have no reason to believe he would not have been convicted.

VII.   Denial of Second Motion to Dismiss for Violation of the Speedy Trial Act

Carnes argues that the district court erred by denying his second motion to dismiss for violation of the Speedy Trial Act. On February 22, 1999, Carnes filed a motion for adjournment of the trial date. The motion was granted and

significant intrusion into his life outside the parole context. Michigan Administrative Code § R 791.7735 only speaks to warrantless searches for evidence of a parole violation, or of facially incriminating evidence in plain view. Carnes could not reasonably expect significant governmental intrusion into his life outside of the parole context from a regulation pertaining solely to investigations of parole violations.[2]

Therefore, we conclude that the government agents required a warrant and probable cause to both seize and listen to the tapes found at 1731 Harmon. *See United States v. Johnson*, 994 F.2d 980, 987 (2d Cir. 1993), *cert. denied,* 510 U.S. 959 (1993) (requiring warrant supported by independent probable cause to listen to audio tapes, even if properly seized). The district court erred when it denied Carnes's motion to suppress these tapes.

F.

The final issue is the effect of this violation. Not all Fourth Amendment violations require reversal. *See Chapman v. California*, 386 U.S. 18 (1967). The government bears the burden of proving that such a constitutional error was harmless beyond a reasonable doubt. *Id.* at 23-24. If there is a reasonable probability that the evidence complained of contributed to the conviction, then the error cannot be considered harmless. *Id.* "To determine whether the error was harmless under *Chapman* the question this court must ask is whether, absent the improperly admitted [evidence], it is clear beyond a reasonable doubt that the jury would have returned a verdict of guilty." *United States v. Wolf*, 879 F.2d 1320, 1324 (6th Cir. 1989).

Here, the convictions for being a felon-in-possession of firearms and ammunition are left perfectly intact without the tapes. It is true that the tapes might, in some small way, tie Carnes to the residence where the guns and ammunition were

---

[2] Basically, Carnes could expect government intrusion into his life to the extent the special needs exception would allow it.

those in *Knights*, it is clear that Carnes did not bargain away the scope of rights that Knights did.

In *Knights,* the probation search condition stated that Knights would "[s]ubmit his . . . person, property, place of residence, vehicle, personal effects, *to search at anytime, with or without a search warrant, warrant of arrest, or reasonable cause by any probation officer or law enforcement officer.*" *Knights*, 122 S. Ct. at 589 (emphasis added). Thus, the agreement clearly dispensed with any requirement of reasonable cause or suspicion prior to an investigation or search. It is difficult to imagine a search condition more intrusive on a person's Fourth Amendment rights. The Supreme Court, as explained in footnote 6 of the *Knights* opinion, only treated the search as being conducted pursuant to reasonable suspicion to avoid other constitutional questions. *See id.* at 592 n.6. The Court did not, however, rewrite the agreement itself to include a reasonable suspicion requirement. Although the question of whether Knights could waive his Fourth Amendment rights completely was reserved, the agreement that Knights submitted to evinced that he was expecting to forgo practically all of his Fourth Amendment rights. *See id.* at 591

Carnes's parole agreement is wholly different from Knights's probation search condition. While Carnes agreed to take on certain obligations, such as the residency requirement, the agreement itself never showed that he was willing to forego his privacy rights by expressly allowing the police greater authority to search him and his residence. As to him, the parole agreement only allowed government agents to search him for a greater number of things: for example, an ordinary citizen could not be searched on suspicion that he was not living with his sister. Unlike Knights's agreement, nothing in Carnes's agreement shows that he would expect the police to be able to search him without probable cause or a warrant.

Neither does the Michigan Regulation governing supervision of parole indicate that Carnes could expect

the trial was set for March 30, 1999. Carnes's counsel stipulated that "Carnes agrees that all time attributable to this motion including all delay from the filing of the motion to date of trial shall be deemed excludable from the Speedy Trial Act."

In a challenge to a denial of a motion to dismiss for violations of the Speedy Trial Act, we review the district court's legal conclusions *de novo*, and its factual findings for clear error. *United States v. Robinson*, 887 F.2d 651, 656 (6th Cir. 1989).

In granting the February 22 motion, the district court made a finding of fact that "Carnes specifically indicated to [his then-counsel] Mr. Annenberg . . . that he desires to waive his speedy trial rights as they pertain to the granting of this motion." Carnes has produced no evidence to indicate that this factual finding was clear error. As a result, we find that the district court properly ruled that he had waived his Speedy Trial Act rights and that no dismissal was required.

In his reply brief, Carnes claims that even if his counsel's stipulation waived a Speedy Trial Act claim, that stipulation was made without his approval and should provide a basis for a finding of ineffective assistance of counsel. Because we see no evidence to contradict the factual finding that Carnes consented to the delay, we do not find any ineffectiveness of counsel.

For these reasons, we affirm Carnes's convictions for possession of a firearm by a felon, possession of ammunition by a felon, and witness tampering. The case is remanded for resentencing following final disposition of count three of the superceding indictment.

—————————

### OPINION

—————————

KEITH, Circuit Judge.

VIII.  Motion to Suppress the Audio Tapes

Carnes argues that the district court erred in denying his motion to suppress audio tapes seized and listened to without a search warrant. We hold that the government's actions with respect to six of the tapes violated the Fourth Amendment's prohibition of unreasonable searches and seizures. The district court should have granted Carnes' motion in part, suppressing the first six tapes found at 1731 Harmon on January 14, 1997. The district court, however, properly denied Carnes's motion with respect to the seventh tape, found months later under Kellum's house. Therefore, we REVERSE the conviction for illegal interception of a wire communication.

### A.

Six audio tapes were seized at 1731 Harmon Street during the search immediately following Carnes's arrest on January 14, 1997. The police and parole officers entered the Harmon Street residence with warrants to arrest Carnes for illegal entry, assault and battery, and being a parole absconder. Several months later, in the spring of 1997, another government agent found a cassette recorder under Kellum's trailer-home. Kellum had no knowledge of the recorder's presence. Inside the recorder was one additional tape ("the seventh tape").

The six tapes seized on January 14, 1997 were first listened to three months later, after the hearing concerning the suspected parole violations. They contained phone conversations taped from Kellum's home. Some of the conversations were threatening phone calls from Carnes. Others were ordinary phone calls to Kellum from relatives

privacy, "assessing, on the one hand, the degree to which [a search] intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Knights*, 122 S. Ct. at 591 (quoting *Ohio v. Robinette*, 519 U.S. 33, 39 (1996)).

Carnes's status as a parolee informs both sides of the balance. Parolees do not enjoy the full panoply of rights afforded the average citizen. *See Morrissey*, 408 U.S. at 494. They have previously been found guilty of a crime, which allows the state to impose "extensive restrictions" on their liberty. *Id.* at 483. Similarly, they know that at any time, they may be sent back to jail for conduct that would be perfectly lawful for the average citizen.

In assessing the governmental interests side, many of the concerns articulated in *Knights* with regard to probationers are applicable. However, a brief account of statistics specific to parolees is warranted. Parolees, like probationers, are far more likely than the average citizen to commit a crime. In 1998, of 6,134,200 total persons under community supervision, jail, or prison, 696,385 were on parole. U.S. Department of Justice, Bureau of Statistics, *Probation and Parole in the United States,* 2001 NCJ 188208 (Washington D.C.: U.S. Department of Justice, 2001), p. 3. In 1998, 42% of parolees were returned to jail or prison and 9% absconded. U.S. Department of Justice, Bureau of Statistics, *Probation and Parole in the United States,* 1998 NCJ 178234 (Washington D.C.: U.S. Department of Justice, 1999), p. 7. In 1999, 14.4% of all Federal Parolees had their parole terminated because of a new crime, 13.0% because of drug use, and 4.3% because of their fugitive status. U.S. Department of Justice, Bureau of Statistics, *Compendium of Federal Justice Statistics,* 1999 NCJ 186179 (Washington, D.C.: U.S. Department of Justice, 2001), p. 97.

Assessing Carnes's privacy interests, we look to Carnes's expectations when negotiating his parole agreement, including Michigan Regulations applicable to him once he accepted the terms of his parole. Comparing these facts with

government cites *United States v. Knights,* 112 S. Ct. 587, 593 (2001).

In *Knights*, the Supreme Court stated that the Ninth Circuit used "dubious logic" when it affirmed the suppression of evidence seized at probationer Knights's apartment based solely on the special needs analysis from *Griffin. Id.* at 590-91.  The *Knights* Court highlighted *Griffin's*  express statement that its special needs holding made it unnecessary to determine whether warrantless searches of probationers were otherwise reasonable within the meaning of the Fourth Amendment.  *Id*.  Next, the Supreme Court validated the warrantless search at issue under the "general Fourth Amendment approach of 'examining the totality of the circumstances' ".  *Id.* at 591 (internal citations omitted). Weighing the totality of the circumstances, the Supreme Court found that defendant Knights had a diminished expectation of privacy.  The Court was especially influenced by two facts: (1) that Knights was a probationer, and (2) the terms of Knights's probation agreement, including a "probation search condition." *See id.* at 590-593.

Paying particular attention to the facts of Knights's case, the Court rejected the proposition  that the government can search all probationers and parolees without a warrant and probable cause.  Rather, the Court described Knights's own probation search condition as a "salient circumstance" affecting the "balance of [the] considerations [which] require[d] no more than reasonable suspicion to conduct a search of *this* probationer's house".  *Id.* at 591-92 (emphasis added); *see also Morrissey v. Brewer*, 408 U.S. 471, 482 (1972) ("the liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty"). Additionally, such a categorical rule permitting any search of a probationer or parolee, with or without a warrant or probable cause, would have made the special needs analysis of *Griffin* completely unnecessary.

Therefore, we look to the facts specific to this case in determining whether Carnes had a diminished expectation of

and friends.  Carnes filed a motion to suppress these tapes, arguing that they were seized and listened to in violation of his Fourth Amendment rights.  The district court denied the motion, finding that the special needs of the Michigan parole system justified the warrantless seizure and use of the tapes.

### B.

On appeal, Carnes argues that the authorities had neither the right to seize the tapes nor the right to listen to them because they did not facially indicate any relationship to a parole violation or criminal act.  The government concedes that they did not possess a search warrant to seize the tapes or to listen to them.  The government argues that their actions were nevertheless lawful, for three reasons.  First, the government claims that Carnes lacked standing because he had no reasonable expectation of privacy as to recordings of conversations obtained illegally. Second, the government argues that because Carnes was a parolee, the special needs of law enforcement allowed the government to seize and use the tapes without a warrant or probable cause.  Third, the government contends that under the totality of the circumstances, Carnes had a diminished expectation of privacy such that the usual Fourth Amendment requirements were not applicable.

### C.

First, the government's argument that Carnes lacked an expectation of privacy as to the tapes because their content was illegally obtained is not convincing.  The analogy between a car thief's right to privacy in a stolen vehicle and Carnes's right with respect to the tapes at issue is strained. The tapes themselves were not stolen, nor was the briefcase in which they were found.  Moreover, illegally obtained objects, such as contraband, are often suppressed. *See, e.g. United States v. Smith,* 263 F.3d 571 (6th Cir. 2001).  The legality of a person's possession cannot be the lynchpin of their Fourth Amendment standing.  Carnes thus had some expectation of privacy in the six tapes seized at 1731 Harmon.

However, with respect to the seventh tape, the one found under Kellum's home, Carnes had no expectation of privacy.

> Since the decision in *Katz v. United States,* 389 U.S. 347 (1967), it has been the law that "capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 143 (1978). A subjective expectation of privacy is legitimate if it is " 'one that society is prepared to recognize as "reasonable," ' " *id.,* at 143-144, n.12, quoting *Katz, supra*, at 361 (Harlan, J., concurring).

*Minnesota v. Olson*, 495 U.S. 91, 95 (1990). Carnes never lived at this house and certainly was not present in it or in possession of the recorder or the tape when Kellum turned them over to the police. It would be unreasonable for him to claim an expectation of privacy with respect to something that he had no control or dominion over. Therefore, we hold that the district court properly admitted the seventh tape into evidence.

### D.

The government's argument, relied upon by the district court, that the special needs of law enforcement allowed the government to seize and listen to the six tapes seized at 1731 Harmon, is unavailing. In *Griffin v. Wisconsin,* 483 U.S. 868 (1987), the Supreme Court found that the unique circumstances of probation created "special needs, beyond the normal need for law enforcement". *Id.* at 873.[1]  Therefore,

---

[1] Additionally, the grant of parole is usually not the result of a judicial finding, but of an administrative or legislative process. *See Morrissey,* 408 U.S. at 480 (parole "is not directed by the court but by an administrative agency"); BLACKS LAW DICTIONARY 1116 (6th ed. 1990) ("The granting, denying, revocation, and supervision of parole for federal prisoners rests in the U.S. Parole Commission" and "'parole' relates to executive action") (citations omitted). Therefore, when

pursuant to a reasonable regulatory or administrative scheme authorizing such action, the police could search a probationer's residence without a warrant, if they had reasonable cause to believe that a violation of a probation condition was taking place.  *See id*.

At the suppression hearing, the government argued that the tapes were seized to help establish a violation of the residency requirement of Carnes's parole agreement. *See United States v. Carnes*, 51 F.Supp.2d 829 (E.D. Mich. 1999). The fact that the tapes were not listened to until well after the parole hearing shows that they were not originally seized, nor subsequently listened to, pursuant to the special authority granted the government for supervising parolees. Through all stages of this case, the government has never offered a reason why it did not listen to the tapes immediately after, or even shortly after, they were seized. To the extent the government now offers reasons why the tapes were originally seized, we cannot entertain them. Where the government claims that "special needs" of law enforcement justify an otherwise illegal search and seizure, a court must look to the "actual motivations of individual officers". *See United States v. Knights*, 112 S. Ct. 587, 593 (2001); *see also Griffin*, 483 U.S. at 875 (suggesting that special needs searches must be confined in scope). Here, there is no evidence that the officers who seized the six tapes on January 14, 1997, were motivated by a desire to establish a violation of the residency requirement of Carnes's parole agreement. Rather, the government's failure to listen to the tapes until well after the parole hearing suggests some other motivation.

### E.

Finally, the government argues that under the totality of the circumstances, Carnes had a diminished expectation of privacy such that the usual Fourth Amendment protections were not applicable to him. For this proposition, the

---

investigating parole violations, judicial interference is less warranted.