KAREN NELSON MOORE, Circuit Judge,
concurring in the judgment.
In this case, the Government — without a warrant — used a hidden video camera to monitor surreptitiously and continuously Bagshaw’s activities on her private, residential property for twenty-four days. Because this kind of long-term video surveillance invaded Bagshaw’s legitimate expectation of privacy, I would hold that the Government’s conduct violated the Fourth Amendment right to be free from unreasonable searches.
I. FOURTH AMENDMENT ANALYSIS
The Fourth Amendment protects “[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.” U.S. CONST, amend. IV. In evaluating whether a search was reasonable under the Fourth Amendment, we ask “whether a person has a ‘constitutionally protected reasonable expectation of privacy.’ ” California v. Ciraolo, 476 U.S. 207, 211, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986) (quoting Katz v. United States, 389 U.S. 347, 360, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring)). The district court found that Bagshaw did not have a reasonable expectation of privacy because the area being continuously filmed was “visible from either adjoining lot,” and therefore Bagshaw’s activities were knowingly exposed to the public. See United States v. Anderson-Bagshaw, No. 1:11—CR-257, 2011 WL 3901880, at *3 (ND.Ohio Sept. 6, 2011). This analysis relies on prior cases holding that “[a]s a general proposition, the police may see what may be seen ‘from a public vantage point where [they have] a right to be.’ ” Florida v. Riley, 488 U.S. 445, 449, 109 S.Ct. 693, 102 L.Ed.2d 835 (1989) (quoting Ciraolo, 476 U.S. at 213, 106 S.Ct. 1809). For example, the Court upheld against a Fourth Amendment challenge aerial observation from “public navigable airspace” of an individual’s marijuana plants in his backyard. Ciraolo, 476 U.S. at 213, 106 S.Ct. 1809. The Court held that an individual could not legitimately expect privacy in his backyard against “physically non-intrusive” observation by the government when such a view was readily available to “a power company repair mechanic on a pole overlooking the yard.” Id. at 213, 215, 106 S.Ct. 1809. The majority likewise finds this precedent decisive as to the video footage of Bagshaw’s backyard area.[1] Along similar lines, the majority concludes that the long-term video surveillance of the barnyard and pasture areas of Bagshaw’s property was not subject to protection under the Fourth Amendment, relying on the open-fields doctrine. The majority argues that the continuous monitoring of the barnyard and pasture areas was reasonable because “an individual has no legitimate expectation that open fields will remain free from warrantless intrusion by government officers.” Oliver v. United States, 466 U.S. 170, 181, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984).
*420 These cases are not sufficient to reject Bagshaw’s Fourth Amendment challenge. Because the intrusion caused by the search in this case was more severe, given its mode, intensity, and duration, than the brief fly-overs and visual inspections condoned in Oliver and Ciraolo, those cases are distinguishable from the facts presented here. See United States v. Cuevas-Sanchez, 821 F.2d 248, 251 (5th Cir.1987) (distinguishing long-term video surveillance from one-time flyovers on the basis of relative intrusiveness, and stating that “[i]t does not follow that Ciraolo authorizes any type of surveillance whatever just because one type of minimally-intrusive aerial observation is possible”). The search of Bagshaw’s property through the use of long-term, covert, continuous video surveillance is different from and far more intrusive than the searches held to be reasonable in prior cases.
These differences matter, because the proposition that individuals do not have a reasonable expectation of privacy in areas exposed to the public is not without limits — rather, the Supreme Court has considered the intrusiveness of the search when analyzing the bounds of an individual’s expectation of privacy. For example, in Bond v. United States, 529 U.S. 334, 120 S.Ct. 1462, 146 L.Ed.2d 365 (2000), the Court held that the Fourth Amendment was violated when police officers manipulated a bus passenger’s bag in an exploratory manner. The Government had argued that because the passenger knowingly exposed his bag to the public, he “lost a reasonable expectation that his bag would not be physically manipulated.” 529 U.S. at 337, 120 S.Ct. 1462. This argument relied on the prior Supreme Court precedents in Ciraolo and Riley “for the proposition that matters open to public observation are not protected by the Fourth Amendment.” Id. But the Court held that this proposition was not without limitation, and that a search of an object or area exposed to the public could be unreasonable, given its relative intrusiveness. See id. (distinguishing earlier cases allowing a search of an area or object exposed to the public because the nature of the search was different in this case: “[pjhysically invasive inspection is simply more intrusive than purely visual inspection”); see also United States v. Place, 462 U.S. 696, 707, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) (holding that although “a person possesses a privacy interest in the contents of personal luggage,” a canine sniff of the bag did not violate the Fourth Amendment because “the manner in which information is obtained through this investigative technique is much less intrusive than a typical search”). Bond “reaffirmed the general principle that the nature of the intrusion by the government can have an effect on whether a citizen has a legitimate expectation of privacy.” United States v. Nerber, 222 F.3d 597, 601 (9th Cir.2000). These cases stand for the idea that expectations of privacy with respect to an area or object searched are not all-or-nothing; rather, a person’s reasonable expectations of privacy depend on the intrusiveness of the search.
Accordingly, just because society is willing to accept reasonable searches by the government of open fields and curtilage on private property, this does not render nonexistent the constitutional protections against unreasonable searches in those spaces. Cf. O’Connor v. Ortega, 480 U.S. 709, 731, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987) (Scalia, J., concurring) (“Constitutional protection against unreasonable searches by the government does not disappear merely because the government has the right to make reasonable intrusions in its capacity as employer.”); Nerber, 222 F.3d at 601 (“[T]he legitimacy of a *421 citizen’s expectation of privacy in a particular place may be affected by the nature of the intrusion that occurs.”). Although the public’s ability to access information or view a particular area affects the legitimacy of an expectation of privacy, “the threat or possibility of access is not decisive when it comes to the reasonableness of an expectation of privacy.” United States v. Warshak, 631 F.3d 266, 287 (6th Cir.2010); see also United States v. Taketa, 923 F.2d 665, 673 (9th Cir.1991) (explaining that “[t]he access of others does not defeat [a per-sonas expectation of privacy in his office”). Thus, that a “curious utility worker with a cheap pair of binoculars” could have viewed Bagshaw’s backyard, barnyard, and pasture, see United States v. Anderson-Bagshaw, No. 1:11-CR-257, 2012 WL 774964, at *2 (N.D.Ohio Mar. 8, 2012), does not necessarily mean that the government had an unfettered, unlimited ability to monitor her every move on her own property for weeks at a time. See Cuevas-Sanchez, 821 F.2d at 251. The brief intrusion of the nosy neighbor or the undercover officer is less invasive than prolonged video surveillance; that society is willing to accept the former intrusion as reasonable does not wholly extinguish Bagshaw’s reasonable expectation of privacy that her activities were not being secretly monitored by a hidden camera twenty-four hours a day for several weeks.
“The touchstone of the Fourth Amendment is reasonableness.” Florida v. Jimeno, 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991). Here, the mode of the search (hidden video surveillance), its prolonged duration, and its intensity (the continuous nature of the filming) make it unreasonable. We have recognized that “[v]ideo surveillance in inherently intrusive.” Brannum v. Overton Cnty. Sch. Bd., 516 F.3d 489, 496 (6th Cir.2008). We are far from alone in this observation: many other courts have stated that covert video surveillance is a severe intrusion into a person’s privacy expectations, which “provokes an immediate negative visceral reaction” and “raises the spectre of the Orwellian state.” Cuevas-Sanchez, 821 F.2d at 251; see, e.g., Nerber, 222 F.3d at 603 (“Hidden video surveillance is one of the most intrusive investigative mechanisms available to law enforcement.”); United States v. Falls, 34 F.3d 674, 680 (8th Cir.1994) (“It is clear that silent video surveillance ... results in a very serious, some say Orwellian, invasion of privacy.”); United States v. Koyomejian, 970 F.2d 536, 551 (9th Cir.1992) (Kozinski, J., concurring) (“As every court considering the issue has noted, video surveillance can result in extraordinarily serious intrusions into personal privacy.”); United States v. Mesa-Rincon, 911 F.2d 1433, 1445 (10th Cir.1990) (finding video surveillance to be “extremely intrusive”); United States v. Torres, 751 F.2d 875, 882 (7th Cir.1984) (Posner, J.) (‘We think it also unarguable that television surveillance is exceedingly intrusive ... and inherently indiscriminate, and that it could be grossly abused— to eliminate personal privacy as understood in modern Western nations.”); Carter v. Cnty. of L.A., 770 F.Supp.2d 1042, 1050-51 (C.D.Cal.2011) (“Covert video surveillance is not a traditional tool.... Outside of a strip search or a body cavity search, a covert video search is the most intrusive method of investigation a government employer could select. Secret videotaping goes against the grain of our strong anti-Orwellian traditions.”). That Bag-shaw was being monitored continuously by a hidden video camera, which could pan and zoom at the will of Agent Morgaño from the comfort of Morgano’s own home, is deeply troubling, given the Fourth Amendment’s role in “guaranteeing] the privacy, dignity, and security of persons against certain ... invasive acts by offi *422 cers of the Government.” Skinner v. Ry. Labor Execs.’ Ass’n, 489 U.S. 602, 613-14, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989).
The Government seeks to downplay the severity of its intrusion by arguing that its use of the hidden video camera merely enhanced what would have otherwise been a permissible investigation technique of physical visual surveillance from a publicly available vantage point. See Appellee Br. at 29-30; see also Dow Chem. Co. v. United States, 476 U.S. 227, 238, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986) (permitting aerial observation with enhancing camera technology of an industrial complex without a warrant, even though the government used a camera that provided “more detailed information than naked-eye views”). The use of hidden video cameras to aid visual surveillance has been sanctioned by one of our sister circuits on this ground — as a mere improvement in efficiency. See United States v. Vankesteren, 553 F.3d 286, 291 (4th Cir.2009) (considering long-term video surveillance and stating that while the government “could have stationed agents to surveil Vankesteren’s property twenty-four hours a day.... [t]hat the agents chose to use a more resource-efficient surveillance method does not change our Fourth Amendment analysis”).
However, there is more to the issue than merely increased cost-effectiveness — the surreptitiousness of the observation which is enabled through the use of hidden video cameras means that law-enforcement agents can observe more than they would be able to if they were using physical surveillance. This appears to have been exactly the case in the Bagshaw investigation: the investigators resorted to hidden video cameras because the physical presence of agents on or near Bagshaw’s property was too visible. Agent Morgaño testified during the suppression hearing that:
We utilized the worker’s compensation analyst in his vehicle up to that point [before the pole camera was installed] conducting surveillance, but given the nature of it being a rural neighborhood and not heavily foot traffic in the businesses, he was very noticeable in his presence. So we opted to remove him from that situation.
R. 57 (Suppression Hearing Tr. at 12:21-13:1) (Page ID # 697-98); see id. at 41:14-42:1 (Page ID # 726-27) (acknowledging that physical surveillance was not undertaken because of a concern that Agent Morgaño would be identified and noticed by Bagshaw). In other words, the surreptitiousness of the surveillance is worrisome because “it evades the ordinary checks that constrain abusive law enforcement practices: ‘limited police resources and community hostility.’ ” United States v. Jones, 565 U.S. -, 132 S.Ct. 945, 956, 181 L.Ed.2d 911 (2012) (Sotomayor, J., concurring) (quoting Illinois v. Lidster, 540 U.S. 419, 426, 124 S.Ct. 885, 157 L.Ed.2d 843 (2004)); see also J. Amy Dillard, Big Brother Is Watching: The Reality Show You Didn’t Audition For, 63 OKLA. L. REV. 461, 498 n. 231 (2011) (stating that “[t]echnologically enhanced surveillance does not merely substitute for in-person surveillance” because it makes the presence of the police invisible).
As the increasing technical capacity of the government makes this kind of long-term hidden video surveillance more feasible and readily available, individual privacy becomes threatened. Courts are often confronted with increasingly intrusive forms of surveillance enabled by technological advancements, and we must carefully consider “what limits there are upon this power of technology to shrink the realm of guaranteed privacy.” Kyllo v. United States, 533 U.S. 27, 34, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001); see also *423 Jones, 132 S.Ct. at 962-63 (Alito, J., concurring) (explaining the ways in which technological progress may influence privacy expectations); United States v. Garcia, 474 F.3d 994, 998 (7th Cir.2007) (“Technological progress poses a threat to privacy by enabling an extent of surveillance that in earlier times would have been prohibitively expensive.”). We recently recognized in Warshak that “the Fourth Amendment must keep pace with the inexorable march of technological progress, or its guarantees will wither and perish.” Warshak, 631 F.3d at 285. Thus, we must carefully consider the ways in which the government’s capacity to monitor continuously and surreptitiously an individual’s behavior through hidden video surveillance — without a warrant — may impinge on the privacy and dignity guaranteed by the Fourth Amendment.
As the majority points out, five Justices of the Supreme Court recently indicated in Jones that there may be constitutional concerns with long-term warrantless surveillance of individuals. See Jones, 132 S.Ct. at 964 (Alito, J., concurring) (“[Society’s expectation has been that law enforcement agents and others would not— and indeed, in the main, simply could not — secretly monitor and catalogue every single movement of an individual’s car for a very long period.”); id. at 955 (Sotomayor, J., concurring) (agreeing with Justice Alito that long-term GPS monitoring offends expectations of privacy). These concerns are founded upon a recognition that long-term monitoring enables the government to obtain a different set of information than a single visual observation of an area. Cf. id. at 955 (Sotomayor, J., concurring) (“GPS monitoring generates a precise, comprehensive record of a person’s public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations.”). This makes long-term surveillance more intrusive than a fly-over or transitory visual observation. See id. at 956 (“Awareness that the Government may be watching chills associational and expressive freedoms. And the Government’s unrestrained power to assemble data that reveal private aspects of identity is susceptible to abuse.”); Daniel J. Solove, Conceptualizing Privacy, 90 CAL. L. REV. 1087, 1130-31 (2002) (“Being watched can destroy a person’s peace of mind, increase her self-consciousness and uneasiness to a debilitating degree, and can inhibit her daily activities- An important dimension of privacy is informational control, which does not readily translate into spatial terms.”); cf. United States v. White, 401 U.S. 745, 787, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971) (Harlan, J., dissenting) (“Authority is hardly required to support the proposition that words would be measured a good deal more carefully and communication inhibited if one suspected his conversations were being transmitted and transcribed. Were third-party bugging a prevalent practice, it might well smother that spontaneity — reflected in frivolous, impetuous, sacrilegious, and defiant discourse — that liberates daily life.”).
In United States v. Oliver, 686 F.2d 356 (6th Cir.1982) (en banc), aff'd, 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984), even as we robustly affirmed the open-fields doctrine, we maintained that the Fourth Amendment “would protect a person in an open field.” 686 F.2d at 360. This makes sense, because the Fourth Amendment “protects people, not places.” Katz, 389 U.S. at 351, 88 S.Ct. 507. We explained that the Fourth Amendment principles articulated by courts protect privacy by “establishing] an environment in which individual emotional and mental processes can develop freely without surveillance or interference.” Oliver, 686 F.2d at 360 (emphasis added). This important *424 freedom is threatened by the severely intrusive tactics used to monitor continuously Bagshaw’s activities on her residential property — warrantless, long-term secret video surveillance. Bagshaw’s expectation that she would not be monitored continuously on her own property is reasonable. In sum, I would hold that the video surveillance obtained using the pole camera in this case was an unreasonable search which violated Bagshaw’s Fourth Amendment rights.
II. HARMLESS ERROR
The next question that we must address is whether the constitutional violation was harmless such that reversal of the convictions is not required. When evidence obtained in violation of the Fourth Amendment is admitted improperly, reversal is required “[i]f there is a reasonable probability that the evidence complained of contributed to the conviction.” United States v. Carnes, 309 F.3d 950, 963 (6th Cir.2002); see Chapman v. California, 386 U.S. 18, 22-24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). “‘To determine whether the error was harmless under Chapman the question this court must ask is whether, absent the improperly admitted [evidence], it is clear beyond a reasonable doubt that the jury would have returned a verdict of guilty.’ ” Carnes, 309 F.3d at 963 (quoting United States v. Wolf, 879 F.2d 1320, 1324 (6th Cir.1989)).
The jury was shown twelve minutes and forty-six seconds of footage from the pole camera.[2] This footage contained clips showing Bagshaw raking, mowing the pasture area, pulling a wagon, pushing a wheelbarrow, bending, squatting, picking up small objects, carrying bags, moving a hose, and bending over to care for an alpaca, among other things. I consider this evidence alongside the other evidence presented at trial as it relates to each count for which the pole-camera footage might have been relevant.[3] “In determining whether an error is harmless, the reviewing court must take account of what the error meant to [the jury], not singled out and standing alone, but in relation to all else that happened.” United States v. Pugh, 405 F.3d 390, 400 (6th Cir.2005) (internal quotation marks omitted).
Counts 1 through 6. Count 1 charged Bagshaw with devising a scheme to defraud the government which involved an alleged “failure] to reveal her ability to work and her work activities” as well as alleged misrepresentations with respect to her medical condition. R. 3 (Indict, at 2-3) (Page ID # 9-10). Counts 2 through 5 charged Bagshaw with making false statements on various EN-1032 forms, in which *425 Bagshaw allegedly “failed to disclose the extent of her work activities.” R. 3 (Indict, at 4-5) (Page ID # 11-12). Count 6 charged Bagshaw with “conceal[ing] her true medical condition and physical abilities from Dr. Amardeep Chauhan.” R. 3 (Indict, at 6) (Page ID # 13). These counts focus on alleged false statements made in connection with (i) Bagshaw’s medical condition, and (ii) Bagshaw’s work activities.
Regarding alleged misrepresentations with respect to Bagshaw’s medical condition or physical capabilities, the pole-camera footage largely duplicated other video evidence presented at trial. Although the pole-camera footage showed Bagshaw’s ability to bend over, squat, twist, and carry heavy objects, the cruise footage and the home videos also displayed these abilities. Bagshaw is seen pulling a heavy suitcase in the cruise footage, and she is seen bending, squatting, and twisting in both the cruise footage and the home videos. Even if the jury had not been shown the improper surveillance clips, given the other damaging video evidence demonstrating Bag-shaw’s physical abilities, it is clear beyond a reasonable doubt that a jury would have returned a verdict of guilty on these counts.
Similarly, regarding misrepresentations relating to the extent of Bagshaw’s work activities, the pole-camera footage was du-plicative of other video footage presented to the jury, as well as testimony from Ensie Pinchak. The home videos were particularly harmful to the defense, because they demonstrate Bagshaw’s active involvement with the alpaca farm. Further, there was testimony from Pinchak regarding Bagshaw’s activities relating to the farm. See R. 139 (Trial Tr. at 975-78) (Page ID #2720-23). Given this other evidence, as to Counts 1 through 6, the pole-camera footage was harmless.
Count 7. Count 7 charged Bagshaw with falsely stating that her “back pain, it consumes my brain and ... I can’t focus on things ‘since’ the pain just always like interferes,” when Bagshaw allegedly “was able to focus on matters related to the promotion and operation of a farm, taking classes and seminars, ... functioning during local and extended business and pleasure trips, and performing physical labor at her residence/farm.” R. 3 (Indict, at 6) (Page ID # 13). The pole-camera footage demonstrated Bagshaw’s general ability to perform maintenance on her property, including mowing the lawn and raking leaves, as well as her ability to bend and lift objects with no signs of physical pain. To the extent that the footage showed that Bagshaw could conduct routine activities without showing signs of pain, this evidence was duplicated by other video evidence which showed Bagshaw raking leaves, pulling suitcases, bending, twisting, and showing alpacas at shows. The pole-camera footage was thus harmless with respect to Count 7.
Count 8. Count 8 charged Bagshaw with falsely stating that “[her] husband ... takes care of the alpacas and runs the business” when Bagshaw allegedly “engaged in substantial activities related to the operation” of the alpaca farm. R. 3 (Indict, at 7) (Page ID # 14). Because the majority of the pole-camera footage showed Bagshaw raking, mowing, and picking up objects around the pasture area, the footage was directly relevant to Count 8. However, there was other robust video evidence that Bagshaw was involved in the alpaca farm, including physically caring for the animals, assisting with the shearing of alpacas, and showing alpacas at shows. Further, as outlined above, there was witness testimony indicating that Bagshaw was involved with the alpaca farm, including maintenance of the farm *426 and transporting animals for veterinary care. Thus, there was no reasonable probability that the pole-camera footage contributed to the conviction on Count 8. See Carnes, 309 F.3d at 963.
Count 9. Count 9 charged Bagshaw with making a false statement when she answered “No” in response to the question, “You’re not doing anything to physically care for the ... animals?” R. 3 (Indict, at 8) (Page ID # 15). The pole-camera footage shown to the jury contained four segments showing Bagshaw either chasing after the alpacas or bending over the alpacas to care for them. The jury was also shown the home videos, which contained footage of Bagshaw helping feed the animals, caring for newborn alpacas, chasing the alpacas, and assisting with shearing the alpacas. Additionally, Pinchak testified that she saw Bagshaw working with the animals and feeding the animals two to three times a day. See R. 139 (Trial Tr. at 975-77) (Page ID # 2720-22). Given the direct video evidence in the home videos that showed Bagshaw physically caring for the animals and Pinchak’s testimony, the additional four segments contained in the pole-camera videos were harmless with respect to Count 9.
Count 14. Count 14 charged Bagshaw with making a false statement when she answered “No” in response to the question, “Do you think you could work limited duty or limited hours?” R. 3 (Indict, at 11) (Page ID # 18). Similar to Count 7, to the extent the pole-camera footage showed Bagshaw’s general ability to perform daily activities, this evidence was duplicated by the other video evidence presented to the jury, as well as by the testimony of Pinc-hak. Given the cumulative nature of the video evidence, the pole-camera footage was harmless with respect to Count 14.
Accordingly, I concur with the majority that the admission of the pole-camera footage was harmless error.
III. MULTIPLICITOUS COUNTS
I concur in the majority’s holding that Count 4 and Counts 7 through 14 are not multiplicitous, because each involves proof of a different factual predicate. See United States v. Dedman, 527 F.3d 577, 600 n. 10 (6th Cir.2008) (“Separate allegedly false statements ... are not mere multiple factual predicates but rather are entirely separate offenses.” (internal quotation marks omitted)); United States v. Berardi, 629 F.2d 723, 729 (2d Cir.1980). However, I note that during the December 10, 2008 interview, when the allegedly false statements in Counts 7 through 14 were made, Agent Dancer posed well over one-hundred questions to Bagshaw, many of which were aimed at only a few aspects of the investigation — discovering the extent of Bagshaw’s physical capabilities, and discovering the extent of her activities relating to the alpaca farm. See Gov’t Ex. 12A. A different conclusion may have been warranted if the indictment had charged Bagshaw with multiple counts of making essentially the same false statement in responding to rephrased questions that aimed at a single aspect of the investigation. See Gebhard v. United States, 422 F.2d 281, 289-90 (9th Cir.1970) (“[W]e do not think it proper that the government bludgeon a witness who is lying by repeating and rephrasing the same question, thus creating more possible perjury counts.”); United States v. Clarridge, 811 F.Supp. 697, 705 (D.D.C.1992) (holding that artificial multiplication of charges is improper, and that “[s]eparate counts are only appropriate where the ‘inquiries [are] directed to a separate facet of the overall transaction being investigated’ ” (quoting United States v. Doulin, 538 F.2d 466, 471 (2d Cir.1976))); see also United States v. *427 Ragland, 3 Fed.Appx. 279, 284 (6th Cir.2001).
For the foregoing reasons, I concur in the judgment.

. I agree with the majority’s analysis dividing Bagshaw’s property into the backyard, barnyard, and pasture areas, of which only the backyard constitutes curtilage.

. Because I would hold that the entirety of the pole-camera footage was obtained in violation of the Fourth Amendment, I consider the relative harmlessness of all of the pole-camera clips shown to the jury. This is unlike the majority, which considers only the clips of the backyard area in its harmlessness analysis. Additionally, although Bagshaw urges the court to suppress "the warrantless pole camera surveillance and all fruits of this illegal search and seizure,” see Appellant Br. at 18, Bagshaw does not appear to make the argument that all evidence obtained from the search of her home — which occurred after the police obtained a search warrant — also should be suppressed. Because Bagshaw does not make this argument, I do not consider whether the evidence obtained during the execution of the search warrant was fruit of the poisonous tree that should also be suppressed.

. I exclude Counts 10, 11, 12, and 13 from this analysis because the pole-camera footage was not relevant to demonstrating allegedly false statements relating to income Bagshaw received from business or investment activities, Bagshaw's volunteer activities at alpaca and fleece shows, Bagshaw's driving in relation to the alpaca business, or Bagshaw’s travel outside of Ohio.