**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 06a0797n.06
Filed: October 27, 2006

**No. 05-6516**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| TIMOTHY WAYNE KELLOGG, | ) | EASTERN DISTRICT OF KENTUCKY |
| | ) | |
| Appellant. | ) | |

Before: MERRITT, SUTTON, and GRIFFIN, Circuit Judges.

SUTTON, Circuit Judge. After a grand jury charged Timothy Kellogg with possession of child pornography and after the district court denied his motion to suppress evidence discovered during two searches, Kellogg entered a conditional plea of guilty. On appeal, Kellogg contests the admissibility of evidence uncovered at a friend's farm, a statement he made after his arrest and evidence seized from a storage locker in Lexington, Kentucky. Because the district court correctly rejected each of these arguments, we affirm.

I.

In March 2000, the Lexington-Fayette Urban County Police Department received a report that Kellogg had sexually abused his teenage daughter. During an interview with state police,

Kellogg's daughter revealed that "Kellogg [had] asked her to pose for nude photographs that were to be taken with a digital camera," JA 124, and that she had observed Kellogg viewing child pornography on his computer. She also described several "plastic tubs" that had "lined the halls of the residence" before she left. A subsequent search of Kellogg's residence uncovered neither the tubs nor any evidence of illegal conduct.

Not long thereafter, an acquaintance of Kellogg's contacted the police to report that Kellogg had "cleaned out" his residence in mid-March, that he was planning to store some guns at a friend's farm in Woodford County and that he had asked about local storage facilities. JA 157–58. The farm owner, James White, told the police that Kellogg was a coworker and a friend. White also said that, in mid-March, Kellogg had asked for permission to use White's barn to work on his car, to which White had responded, "Yeah, go down there and make yourself at home," JA 185.

With White's consent, the officers searched the barn, uncovering several weapons and eight closed but unlocked containers bearing Kellogg's name or initials. Among these eight containers were two of the plastic tubs described by Kellogg's daughter. White denied that he had given Kellogg permission to use the barn as a storage facility, and he gave the officers permission to seize the containers and everything inside them. The officers found computer hard drives inside an ammunition box and dozens of compact disks and diskettes inside the two tubs. The police recovered several thousand sexually explicit images of children from the hard drives, the compact disks and the diskettes. Kellogg acknowledges that he owned these containers and their contents.

By October 2003, Kellogg had moved to Columbus, Ohio, to live with his friend Mark Weaver. On October 7, federal law enforcement officers arrested Kellogg at home. While escorting Kellogg out of the house, the officers asked if they could search the car sitting in the driveway. Kellogg responded, "I'd rather you not, you're going to have enough to deal with in there" and motioned towards the house. JA 137. During the arrest, Weaver gave the officers consent to search the shared areas of the residence and assisted the officers by identifying two computers as Kellogg's.

About two weeks later, on October 23, Weaver asked federal officers to remove Kellogg's computer equipment from the house and told them that Kellogg had stored additional equipment in a local storage facility. The officers obtained a warrant the next day to search a storage facility in Columbus after confirming with the facility's manager that Kellogg had rented space there. Although the search did not identify any incriminating evidence, the officers found a digital camera that contained pictures of what appeared to be storage unit D360 at the Versailles Road Mini Storage facility in Lexington, Kentucky. Also in the picture were several of the plastic tubs that had disappeared from Kellogg's house after Kellogg's daughter had left in March of 2000.

At roughly the same time, Weaver called the Columbus police to report that he had received a bill for Kellogg from the Versailles Road Mini Storage of Lexington. Federal officers contacted the manager of the facility and confirmed that Kellogg had been renting unit D360 since March 9, 2000, just two weeks prior to the search of his Lexington home. The manager also notified the officers that even after he had moved to Columbus, Kellogg would check on the items in the unit

every two to three months.  One month later, on November 19, federal agents obtained a warrant to search the Lexington storage unit, where they found dozens of sexually explicit images of children.

A grand jury charged Kellogg with 39 counts of receiving child pornography, *see* 18 U.S.C. § 2252(a)(2), one count of conspiring to receive child pornography, *see* § 2251(b)(1), two counts of possessing child pornography, *see* § 2252(a)(4)(B), and one count of permitting a minor to engage in sexually explicit conduct for the purpose of producing visual depictions for distribution in interstate commerce, *see* § 2251(d).

Kellogg filed a suppression motion on June 10, 2004, claiming that the search at White's farm violated his Fourth Amendment rights and that the warrant to search the Lexington storage unit lacked sufficient evidence of probably cause to support the search.  On July 15, 2004, the district court held a hearing on Kellogg's motion.  At that time, Kellogg did not present any evidence that White had permitted him to store his property in the barn but instead argued that Kellogg's expectation of privacy arose because the boxes were opaque and "secure."  JA  240.  The court denied Kellogg's motion.

Kellogg renewed his motion to suppress on October 29, 2004.  At the motion hearing on December 13, Kellogg testified about what happened at White's farm:  "I had problems with my vehicle . . . I had some stuff in my car and I asked him if I could leave it in his barn. . . . He said I could.  They were up in the loft attic or loft area, it's a second floor of his hay barn.  We put them behind some stuff so his kids wouldn't get in them."  JA 225–26.  Kellogg admitted that he had no

direct evidence that White was coerced into allowing the police on his property and stated that he was "[n]ot at all" surprised "to know that Mr. White was just interviewed . . . and [White stated] that what [Kellogg] ha[d] claimed here in court and in [his] motion is incorrect[.]" Mot. Hr'g Tr. at 12, Dec. 13, 2004. The district denied the renewed motion.

On May 6, 2005, Kellogg filed yet another motion to suppress, reiterating his previous claims and adding a *Miranda* claim. In response, the government filed a declaration signed by Detective Ann Gutierrez, who had participated in the search of White's farm. Attached to the declaration was the transcript of a tape-recorded conversation, dated November 9, 2004, between Gutierrez and White—a conversation that she declared to be accurate under penalty of perjury. In pertinent part, the transcript reads:

| | |
|---|---|
| Gutierrez: | . . . [W]e had heard through some other sources that he had maybe stored some things on your farm. And so we had gone out to your farm. |
| White: | Yes, ma'am. I . . . I remember that very well. |
| Gutierrez: | Ok. Ok. I had spoken recently . . . the case is actually getting ready to go to trial, we're hoping this month. So, we're just trying to touch base with everybody again and make sure that, kind of everything's, the facts are all straight. And we had heard that there were some things that were being presented that were slightly different from the way I remember it. So I wanted to touch base with you. When all of that happened, were you aware that there were things being stored on your farm? |
| White: | No, ma'am. Like I said, things that were being stored there, he did not have my permission to put there. |
| Gutierrez: | Ok. They're presenting a document to the court that's saying that you were allowing him to store things. So that is not true? |

| | |
|---|---|
| White: | No. |
| Gutierrez: | Ok. Ok. I didn't think so. I thought I remember you stating that . . . |
| White: | I allowed him to go out to my farm and work on his vehicle. He came out there, and like I said, I had no idea what was going on behind the scenes. |
| Gutierrez: | Ok. |
| White: | Like I said, you know, he, stayed home from work. He said, "Hey, my car's broke down." I said, "Yeah, go down there and make yourself at home." Because, you know, he is a co-worker, twenty years retired from the Marines. |
| Gutierrez: | Yeah. Yeah. |
| White: | You know, had to have a security clearance to work where we work. |
| Gutierrez: | Right. |
| White: | Never dreamed of anything like that. So . . . |
| Gutierrez: | Ok. Ok. So he was going to work on his car. And as far as you knew, that was it. |
| White: | Right. Like I said, when you guys went down there we found, weapons. |
| Gutierrez: | Right. |
| White: | And stuff like that. Yeah. |
| Gutierrez: | And you had no idea that any idea that any of that was, was there at the time? |
| White: | No, ma'am. |
| Gutierrez: | Ok. Ok. Well, I . . . I thought that's what I recalled, but it looks like they were trying to submit some documents. |

The district court denied Kellogg's third motion to suppress. It held that White had consented to the search of his barn, that Kellogg lacked standing to contest the search and that Kellogg's statement in Columbus did not violate his *Miranda* rights because he had not given the

statement in response to interrogation. Any misleading or inaccurate statements in the search-warrant affidavit, the court found, were not made intentionally or recklessly, and the evidence of continuing criminal activity contained in the affidavit sufficed to sustain a finding of probable cause. Kellogg entered a conditional plea of guilty on all counts, and the court sentenced him (conditionally) to 120 months in prison. On appeal, Kellogg challenges the district court's suppression rulings.

## II.

"When reviewing the denial of a motion to suppress evidence, the appellate court must consider the evidence in the light most favorable to the government." *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998) (en banc). In the light of the evidence presented to the district court, it did not clearly err in denying Kellogg's motion to suppress.

## A.

Kellogg first argues that he had a reasonable expectation of privacy in the containers he stored in White's barn and that the district court erred in concluding that he lacked standing to challenge the search. *See Rakas v. Illinois*, 439 U.S. 128, 140, 143 (1978); *see also Katz v. United States*, 389 U.S. 347, 353 (1967). In support of this contention, Kellogg notes that White gave him consent to store his containers there and that White helped him hide them in the loft. In one sense, Kellogg may be right—at least as a legal matter. If indeed Kellogg had White's permission to store his containers in the barn, then he may have had a reasonable expectation of privacy at stake in the

search, though we need not reach the issue. *See United States v. Carnes*, 309 F.3d 950, 959–60 (6th Cir. 2002); *cf. United States v. Waller*, 426 F.3d 838, 844 (6th Cir. 2005).

The more salient point is that the district court did not credit Kellogg's testimony. It instead credited White's repeated statements that he had never given Kellogg general permission to store property in his barn. JA 184 ("Gutierrez: . . . When all that happened, were you aware that there were things being stored on your farm? White: No ma'am. Like I said, things that were being stored there, he did not have my permission to put there."); *id.* ("Gutierrez: Ok. They're presenting a document to the court that's saying that you were allowing him to store things. So that is not true? White: No. Gutierrez: Ok. Ok. I didn't think so."); JA 184–85 ("White: I allowed him to go out to my farm and work on his vehicle . . . I had no idea what was going on behind the scenes."); JA 185 ("Gutierrez: Ok. Ok. So he was going to work on his car. And as far as you knew, that was it. White: Right. Like I said, when you guys went down there we found[] weapons . . . [a]nd stuff like that. Yeah. Gutierrez: And you had no idea that any of that was, was there at the time? White: No, ma'am. Gutierrez: Ok. . . . I thought that's what I recalled . . . ."). Kellogg offers no reasoned explanation why the district court committed clear error in crediting the one piece of evidence (White's statements) over the other (his own).

Even if we uphold the district court's decision to credit White's testimony, Kellogg persists that White's consent to let him work on his car in the barn and to "make [him]self at home" amounted to a general invitation to use the barn at will. But the district court properly rejected this argument by recognizing the essential context in which the statement was made. Kellogg did not

ask to live in the barn, to sleep there or even to store anything in the barn. He asked only if he could work on his car there, giving him authority at most to "make himself at home" *in working on his car*, not in using the barn as his own storage facility. Even if Kellogg subjectively construed White's reply to mean that he could treat the barn as his own, that does not mean a reasonable person would do so. And we agree with the district court that Kellogg's construction of the remark was not a reasonable one, which removes this case from the orbit of the case law upon which Kellogg relies. *Compare Carnes*, 309 F.3d at 959–60 (finding no reasonable expectation of privacy in an audio tape left at girlfriend's mobile home for several months without her knowledge or consent), *with United States v. Jeffers*, 342 U.S. 48, 50–52 (1951) (finding a reasonable expectation of privacy in a room in which the defendant had access "at will").

To the extent Kellogg means to challenge the process by which the district court rejected this motion to suppress, we disagree. Kellogg challenged the admissibility of this evidence through a motion to suppress on three occasions (or more technically through one suppression motion and two attempts to renew the motion). The district court gave Kellogg several opportunities to present evidence, and the only evidence Kellogg presented was his own testimony. While a subpoena apparently was issued for White to testify at the hearing on Kellogg's second motion, it was never served on him, *see* Mot. Hr'g Tr. at 58–59, Dec. 13, 2004, and Kellogg never asked for an adjournment or another opportunity to present White as a witness on the issue, including most conspicuously in connection with his third motion to suppress. He instead reserved only the right to call White at trial, a trial that never occurred in view of his conditional guilty plea. *Id.* In the end,

Kellogg never gave the district court any evidentiary reason (other than his own testimony) not to believe White's statements. And at no point in his appeal does Kellogg argue that the district court committed reversible error by declining to give him another suppression hearing or by declining to permit him to introduce evidence in support of his motion.

Nor can Kellogg tenably argue that the district court erred in relying on White's statements to the police because White was not available for cross-examination. As the Supreme Court has long made clear, a court may rely on hearsay evidence, otherwise inadmissible at trial, in ruling on a motion to suppress. *See United States v. Raddatz*, 447 U.S. 667, 679 (1980); *Brinegar v. United States*, 338 U.S. 160, 173–74 (1949). Such hearsay evidence, like all admitted evidence, must have some probative value, and a district court would clearly err if its decision were based solely on evidence that was not "competent and credible." *Fields v. Bagley*, 275 F.3d 478, 485 n.5 (6th Cir. 2001). But that was not the case here. The district court had before it two contradictory pieces of evidence: White's statements to the police that he did not give Kellogg general permission to store items in his barn, and Kellogg's testimony that he did. The district court had an opportunity to assess Kellogg's demeanor during his live testimony and obviously chose not to credit his testimony, an assessment that receives deference on appeal. And while White's statements were hearsay, there was no reason not to rely upon them: They were consistent with what White had told police officers at the time of the search; Officer Gutierrez declared under penalty of perjury that the transcript was accurate; and there is no reason to think that White, who had consented to the search in the first instance, suddenly had a reason to dissemble to the police. In ultimately choosing to credit White's

statements, *see* JA 196 (crediting "evidence that Mr. White did not permit the defendant to store items on the property, other than his vehicle" in "find[ing] that the defendant had no reasonable expectation of privacy"), we cannot say that the district court committed clear error.

B.

Kellogg next argues that under *Miranda v. Arizona*, 384 U.S. 436 (1966), the district court should have suppressed the statement he made after his arrest in Columbus, namely his response to a request to search his car: "I'd rather you not, you're going to have enough to deal with in there" as he motioned to the house. At the time of the statement, it is true, Kellogg was in custody, and the police had not yet given him *Miranda* warnings. But the critical point is that he did not make the statement in response to an interrogation, and accordingly it need not be excluded. *See Oregon v. Elstad*, 470 U.S. 298, 317 (1985).

*Rhode Island v. Innis*, 446 U.S. 291 (1980), charts our path. For *Miranda* purposes, *Innis* held that interrogation "extend[s] only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." *Id.* at 302. The officers in this instance requested consent only to search Kellogg's vehicle. They did not ask what was in the vehicle or for that matter what was in the house. When the officers asked permission to search the car, they thus could not have reasonably expected that their request would elicit anything more than a "yes" or "no," which by itself would not have been an incriminating statement. *See United States v. Cooney*, 26 F. App'x 513, 523 (6th Cir. Jan. 22, 2002), *cert. denied*, 535 U.S. 1118;

*see also United States v. McCurdy*, 40 F.3d 1111, 1118 (10th Cir. 1994) ("An officer's request to search a defendant's automobile does not constitute interrogation invoking a defendant's *Miranda* rights."); *United States v. Glenna*, 878 F.2d 967, 971 (7th Cir. 1989) (same).

Contrary to Kellogg's contention, this Circuit has never held otherwise. Two of Kellogg's citations, *Abela v. Martin*, 380 F.3d 915 (6th Cir. 2004), and *United States v. Salvo*, 133 F.3d 943 (6th Cir. 1998), simply have no material bearing on the question at hand. *See Abela*, 380 F.3d at 925 (noting that "the parties do not dispute that [defendant] was . . . subject to custodial interrogation"); *Salvo*, 133 F.3d at 948–53 (examining whether defendant was "in custody" for purposes of *Miranda*); *id.* at 953–55 (examining whether consent to search was voluntary for Fourth Amendment purposes). And the inquiry in *United States v. Crowder*, 62 F.3d 782 (6th Cir. 1995)—asking the defendant to clarify an earlier statement—is several degrees removed from the inquiry here. While a request to clarify an earlier statement is reasonably likely to elicit an incriminating response, *id.* at 786, a request to search a house is not. The district court did not err in rejecting Kellogg's motion to suppress this statement.

C.

Kellogg lastly challenges the sufficiency of the warrant prepared in connection with the search of the Lexington storage facility, claiming that the affidavit failed to establish probable cause when modified by several necessary redactions and additions. This claim, too, fails because Kellogg

has not shown that the affidavit's "remaining content is insufficient to establish probable cause." *United States v. Trujillo*, 376 F.3d 593, 604 (6th Cir. 2004).

As an initial matter, Kellogg cannot prevent the information uncovered during the search of White's barn from being included in the affidavit—as he lacked standing to suppress it. That search uncovered two plastic tubs that contained thousands of sexually explicit images of children. When combined with other incriminating evidence that Kellogg has not challenged, this evidence sufficed to permit a magistrate to find probable cause to search the Lexington storage facility. Even without the other evidence that Kellogg claims should have been excluded from the affidavit, the affidavit included the following evidence: that Kellogg had tried to produce sexually explicit photos of his daughter; that Kellogg's Kentucky residence had contained numerous plastic tubs that were not found in the March 23, 2000 search of his house; that two of those tubs were found in White's barn and each contained sexually explicit images of children; that Kellogg had asked a friend about local storage facilities at the time; and that Kellogg had maintained a storage unit at the Lexington facility since March 9, 2000. Even without the other contested evidence, such as the digital image of one of Kellogg's plastic tubs outside the Lexington storage unit, the affidavit sufficiently linked Kellogg's criminal activities to the Lexington unit. *See United States v. Smith*, 182 F.3d 473, 477 (6th Cir. 1999) (noting that probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity") (internal quotation marks omitted).

III.

For these reasons, we affirm.

GRIFFIN, Circuit Judge, concurring in part, and dissenting in part.

I join in Section II.B. of the majority opinion and in the result of Section III.C.  However, I disagree with the statement of facts (Section I) and respectfully dissent with regard to Section II.A. Based on the present record, I would hold that the district court clearly erred in its ruling on defendant's third motion to suppress the evidence found in the closed containers.  Accordingly, I respectfully concur in part and dissent in part.  I would remand for further proceedings.

I.

On June 10, 2004, defendant first moved to suppress the evidence discovered in the closed containers stored in James White's barn.  At a hearing held on July 15, 2004, the district court engaged in a colloquy with counsel, but rendered no findings of fact.  An order summarily denying the motion to suppress was entered July 15, 2004.

Defendant's second motion to suppress was filed October 29, 2004.  At the conclusion of a hearing held December 13, 2004, the court denied the motion, ruling as follows:

> I have heard nothing to indicate that Mr. White didn't give his permission for these officers to look through that stuff.  Mr. White clearly had as much right to access to that.  It was not under lock and key.  It was just left there.  Yeah, granted they hid it, according to Mr. Kellogg, to keep the children from getting in it.  But that doesn't mean that Mr. White couldn't have gotten in it.  *He knew where it was, knew exactly where it was.  And he showed the officers and said that they could look at it.*  Like I said the first time, I don't see there is any problem with him giving consent to look at that stuff.

- 15 -

> Once they have a right to find stuff that is incriminating, they have got a right to seize it and anything that looks like it might have incriminating evidence, including hard drives, computer disks and other things. So that seizure doesn't bother me at all.

(Emphasis added.)

Defendant's third motion to suppress was filed May 6, 2005. Although a hearing was originally scheduled, the court cancelled the hearing, and in a written opinion and order dated May 20, 2005, denied defendant's motion. In opposition to defendant's third motion to suppress, the government filed an unsworn written statement of Detective Ann Gutierrez dated May 18, 2005. The statement was not an affidavit, and Gutierrez was not under oath when she wrote "I declare under the penalty of perjury that the statements set forth below are true and correct to the best of my knowledge." Detective Gutierrez's unsworn declaration attached as Exhibit B an unauthenticated transcript of a recorded telephone conversation she purportedly had with James White on November 9, 2004. Kellogg was not afforded an opportunity to respond or rebut these hearsay statements filed by the government only two days before the court's May 20, 2005, order.

In denying defendant's motion to suppress, the district court relied upon this unsworn, unauthenticated transcript that was apparently transcribed by the police. Rejecting defendant's motion, the court stated the following in its May 20, 2005, written order:

> First, as to the evidence seized at the White Farm, the Court finds that the property owner, Mr. White, provided the police with valid consent to search the barn on Mr. White's property. (Pl.'s Resp. to First Mot. to Suppress, Ex. A.) The defendant did not present any credible evidence that Mr. White was coerced into signing the

consent form, other than mere speculation that it occurred. The government, on the other hand, presented evidence that Mr. White did not permit the defendant to store items on the property, other than his vehicle. (Pl.'s Resp. to Third Mot. to Suppress, Ex. A.) Thus, the Court finds that the defendant had no reasonable expectation of privacy as to the evidence seized at the White Farm. As such, the defendant may not contest the search of the White Farm. *United States v. Gillis*, 358 F.3d 386, 391 (6th Cir. 2004).

The majority inaccurately states: "White denied that he had given Kellogg permission to use the barn as a storage facility." However, White's statement, when viewed literally, means the opposite. At a minimum, it is ambiguous. The telephone transcript states, in pertinent part, the following:

> Gutierrez: Ok. Ok. I had spoken recently . . . the case is actually getting ready to go to trial, we're hoping this month. So, we're just trying to touch base with everybody again and make sure that, kind of everything's, the facts are all straight. And we had heard that there were some things that were being presented that were slightly different from the way I remember it. So I wanted to touch base with you. When all of that happened, were you aware that there were things being stored on your farm?

> White: No, ma'am. Like I said, *things that were being stored there, he did not have my permission* to put there.

> Gutierrez: Ok. They're presenting a document to the court that's saying that you were allowing him to store things. *So that is not true*?

> White: *No*.

(Emphasis added.)

White's answer of "No" can be construed as stating that he did not allow Kellogg to store personal property on his premises only if his answer of "No" is deemed as a "Yes." The question was, "So that [Kellogg's statement] is not true?" The answer of "No" literally means that it was true, and, therefore, he allowed Kellogg to store "things" on his premises.

In addition, the questions and answers are ambiguous. White was not asked whether he had granted permission to Kellogg to use the barn as a storage facility. Rather, he was asked whether he was "aware *that there were things* being stored on your farm?" (Emphasis added.) White's answer can reasonably be interpreted to mean that he never granted Kellogg the right to store *illegal* "things" on his property, such as child pornography or guns. However, from the question and answer, it is unclear whether White granted permission for Kellogg to store *legal* items on the property.

Further questions and answers suggest that the consent White refused to give pertained to "weapons" and "stuff like that":

| | |
|---|---|
| White: | I allowed him to go out to my farm and work on his vehicle. He came out there, and like I said, I had no idea what was going on behind the scenes. |
| Gutierrez: | Ok. |
| White: | Like I said, you know, he, stayed home from work. He said, "Hey, my car's broke down." I said, "Yeah, go down there and make |

yourself at home." Because, you know, he is a co-worker, twenty years retired from the Marines.

Gutierrez:     Yeah. Yeah.

White:     You know, had to have a security clearance to work where we work.

Gutierrez:     Right.

White:     Never dreamed of anything like that. So . . .

Gutierrez:     Ok. Ok. So he was going to work on his car. And as far as you knew, that was it.

White:     Right. Like I said, *when you guys went down there we found, weapons*

Gutierrez:     Right.

White:     *And stuff like that*. Yeah.

Gutierrez:     *And you had no idea that any idea that any of that* [weapons and "stuff like that"] was, *was there at the time*?

White:     No, ma'am.

(Emphasis added.)

When reviewing the denial of a motion to suppress evidence, we consider the evidence in the light most likely to support the district court's decision. *United States v. Dillard*, 438 F.3d 675, 680 (6th Cir. 2006), *cert. denied*, – U.S. – , 2006 W.L. 2233240 (U.S. Oct. 2, 2006). Further, we will not reverse the factual findings by the district court unless such factual findings are clearly erroneous. *Id*. For purposes of a suppression hearing, a district court may rely on hearsay evidence, but only if the evidence is "credible and competent." *Fields v. Bagley*, 275 F.3d 478, 485 n.5 (6th Cir. 2001). Moreover, the probative value of unauthenticated hearsay evidence is diminished by its lack of reliability. *See generally United States v. Matlock*, 415 U.S. 164, 175-77 (1974) (*reliable* hearsay is admissible on motions to suppress); *United States v. Merritt*, 695 F.2d 1263, 1270 (10th Cir. 1982) (considering factors of reliability and corroboration); *United States v. Schaefer*, 87 F.3d 562, 570 (1st Cir. 1996) ("[A] judge presiding at a suppression hearing may receive and consider any relevant evidence, including affidavits and unsworn documents *that bear indicia of reliability*.") (emphasis added); JOHN W. STRONG ET AL., MCCORMICK ON EVIDENCE § 353 (4th ed. 1992) (evaluating hearsay evidence in administrative proceedings).

While the trial court is the primary judge of the credibility of witnesses, here, the district judge did not rely on live testimony or the demeanor of any witness in ruling that White had not granted Kellogg permission to store personal property on the premises. Rather, the court relied heavily on an unsworn, unauthenticated transcript of a conversation White allegedly had with Detective Gutierrez. When viewed literally, White's statement supports defendant's position that he had been granted permission to store personal property on the premises. At a minimum, White's

statement is ambiguous. Furthermore, it appears that the district court's findings of fact with regard

to defendant's second and third motions to suppress are contradictory. In particular, if White helped

Kellogg hide the containers and knew where they were, it is reasonable to infer that he granted

Kellogg permission to store the containers.

At oral argument, defense counsel represented to the court that White had been subpoenaed

for the suppression hearings but failed to attend. The government's telephone transcript is unclear

whether the subpoenas issued for White were for the suppression hearings, trial, or both:

| White: | Never have spoke with them [defense counsel]. Like I say, I got that letter back in July of this year. |
|---|---|
| Gutierrez: | Ok. |
| White: | *And I have been, I don't know how many times I have been served a subpoena . . .* |
| Gutierrez: | Yeah. |
| White: | To show up in court and it get postponed. |

The November 9, 2004, telephone conversation occurred after the first July 15, 2004,

suppression hearing but before the second December 13, 2004, hearing. The district court's

December 13, 2004, order denying defendant's second motion to suppress provides: "The

defendant's oral motion for the Clerk to reissue subpoenas for January 13, 2005, at 9:00 a.m. is hereby GRANTED and the clerk shall reissue the defendant's subpoenas for the new trial date."

Regarding the subpoenas, I find it noteworthy that, in the telephone interview, White advised Detective Gutierrez that he had "a problem" complying with them because of his new job in Huntsville, Alabama:

White:      Now, now I got, I got a problem.

Gutierrez:  Ok.

White:      I got a new job in Huntsville, Alabama.

Gutierrez:  Ok.

White:      You know, I don't have the luxury of getting time off and everything.

Gutierrez:  Sure. Well, it was funny because when we stopped past your house we saw the signs that you all were trying to sell. And, I thought, oh, shoot . . . I hope we didn't completely miss you. And then your son said, "Well, he's moving . . . you know he's working down there, but he comes home on the weekends." And I thought, Oh, shoot . . . he's is [sic] just . . .

White:      (Unin)

Gutierrez:     I'll tell you what. I will, I will pass that information on to the prosecutor and make sure that he understands that you are in Huntsville and . . .

White:         Yeah. I'm, I'm down here working full time.

In summary, I conclude that the district court clearly erred in placing great weight on the unsworn, unauthenticated, and ambiguous statements allegedly made by James White to Detective Gutierrez. Despite our deferential standard of review, the present record does not contain reliable evidence supporting the ruling of the district court. For this reason, I would remand for further proceedings.

## II.

With regard to the search of the Lexington storage facility, I agree with the majority that, even without the contested evidence discovered in the barn, sufficient probable cause existed for the issuance of the search warrant. Furthermore, I agree with the learned district judge that the good faith exception of *Leon* applies and validates the search. *United States v. Leon*, 468 U.S. 897 (1984). Finally, I join in Section II.B. of the majority opinion rejecting defendant's Fifth Amendment claim of a *Miranda* violation.

For these reasons, I respectfully concur in part and dissent in part. I would remand for further proceedings.

No. 05-6516
*USA v. Kellogg*