NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0017n.06
Filed: January 9, 2009

No. 07-5466

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

FRANKLIN L. KELLOGG,

    Defendant-Appellant.

    ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE

_____/

BEFORE:    CLAY and KETHLEDGE, Circuit Judges; and OLIVER, District Judge.[*]

    **CLAY, Circuit Judge.**  Defendant Franklin L. Kellogg ("Kellogg") appeals from a district court order convicting him of being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1), possession with intent to distribute cocaine hydrochloride in violation of 21 U.S.C. § 841(a)(1) and possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c). Specifically, Kellogg contends that the district court erred in denying his motion to suppress his statements to investigators; abused its discretion in admitting evidence of a previous armed robbery; and abused its discretion in admitting an in-court witness

_____

[*]The Honorable Solomon Oliver, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

identification. For the following reasons, we **REVERSE** in part and **AFFIRM** in part the judgment of the district court, and **REMAND** the case to the district court for a new trial.

**BACKGROUND**

**I.    Factual Background**

On October 12, 2005, a team of United States Marshals and two detectives with the Marion County Sheriff's Department sought to execute a federal arrest warrant for Kellogg at a duplex located at 111 Old Jasper Highway in South Pittsburgh, Tennessee (the "duplex"). Kellogg was wanted for violating the terms of his supervised release on a prior bank robbery conviction, and was also suspected of a recent armed bank robbery in Guntersville, Alabama. Kellogg had been staying with Tiffany Huckabee ("Huckabee"), a "friend of an associate," for three or four nights. (Joint Appendix ("J.A.") at 367.) Three other adults and Huckabee's two children were also staying in the duplex while Kellogg was there.

From the parking lot outside the duplex, one of the detectives called Huckabee on the telephone and informed her that they had a warrant for Kellogg's arrest. Huckabee responded that Kellogg told her that "he had nothing[.]" (J.A. at 345.) The detective instructed Huckabee and the other residents to come out of the duplex first, and for Kellogg to follow them out. The marshals secured Kellogg, placed him in handcuffs and took him into custody when he came out as instructed. The marshals searched him and found approximately $1,000 on his person.

The marshals contacted Federal Bureau of Investigation ("FBI") Special Agents James Melia ("Melia") and Stanley Ruffin ("Ruffin"), who were helping FBI agents in Alabama investigate Kellogg's involvement in the Guntersville robbery. When Melia and Ruffin arrived at the scene of

the arrest at approximately 7:00 p.m., the marshals informed Melia that they had conducted a security sweep of the duplex and had discovered drugs in one of its bedrooms. Melia spoke with Huckabee and obtained her consent to search the duplex. Melia then approached Kellogg, told Kellogg that he wanted permission to search the residence and presented him with a consent form to search. In response, Kellogg told him that his consent was not necessary, that anything illegal in the apartment was his, and that he did not want Huckabee to be blamed for whatever might be found. Kellogg nevertheless signed the consent form. Prior to conducting the search, the agents asked Kellogg if he had a gun on the premises, and if he had any drugs or drug paraphernalia. Kellogg told the agents where powder cocaine, marijuana, cash and a gun could be found in the residence. Melia also asked Kellogg if the cash drawer from the Guntersville bank robbery was in the duplex. Kellogg responded that the drawer was not in the residence because he "got rid of it in Alabama." (J.A. at 81) The agents recovered from the residence a number of items related to the Alabama bank robbery, including a wristwatch, a New York Yankees baseball cap, and tennis shoes that matched the general description of the robber's clothes and a shoe print taken from the counter of the robbed bank. Agents also recovered two packages of powder cocaine, digital scales and other drug paraphernalia, a nine-millimeter pistol and sixty dollars in cash.

Following the search, Melia and Ruffin transported Kellogg to the FBI office in Chattanooga, Tennessee, for further questioning. Kellogg signed a form waiving his *Miranda* rights at approximately 7:20 p.m., though it is unclear whether this occurred before or after he left with Melia and Ruffin.

3

At the FBI office, Melia and Ruffin questioned Kellogg about the Guntersville robbery. During the questioning, Kellogg stated that he knew he was in "major trouble" because he was caught with a gun and drugs. Regarding the bank robbery, Kellogg told them that "you can close it on me." Melia asked Kellogg if the firearm found at the duplex was the same one used during the Guntersville robbery. According to Melia, Kellogg "told me that if we had ballistic testing on it that the gun would match the gun that was fired in the bank robbery." (J.A. at 83-84.) Melia and Ruffin also asked Kellogg about the $1,000 they found when searching him. Kellogg stated that "it was proceeds from something else" and that he did not want to discuss it. (J.A. at 86.)

On December 13, 2005, a grand jury sitting in the Eastern District of Tennessee issued a three-count indictment against Kellogg. Count one alleged that Kellogg was a felon in possession of a firearm, count two alleged that Kellogg possessed cocaine with intent to distribute, and count three alleged that Kellogg possessed a firearm in furtherance of a drug trafficking crime.

## II. Suppression Hearing

Prior to trial, Kellogg moved to suppress the statements he made outside the duplex and at the FBI office. A suppression hearing was held before a magistrate judge and Kellogg, Melia and Ruffin testified.

Kellogg testified that at the time of the arrest he was "on three [of] what you would call Xanaxes, footballs, the street name is . . . blue footballs." (J.A. at 108.) Kellogg testified that he could not have consented to the search of his residence or waived his rights because "I wasn't in my right frame of mind to waive my rights." (J.A. at 109.) Kellogg also contended that he did not make any statements regarding the ownership or location of drugs, weapons or any of the other items

4

seized during the search of his residence; he had only overheard the marshals discussing items that were recovered during the protective sweep and relayed that information to Melia. Moreover, Kellogg testified that he felt coerced into signing the consent to search form because he wanted Huckabee and her children to be able to return to their home. According to Kellogg, Melia read him the *Miranda* rights waiver form and handed it to him to sign during the car ride to the FBI office.

Melia testified that he brought consent to search and *Miranda* rights waiver forms to Kellogg "just about immediately" after arriving at the duplex, and at that time read Kellogg his *Miranda* rights. (J.A. at 92) Melia stated that although Kellogg signed the consent to search form, he may not have signed the *Miranda* waiver until "later . . . possibly in the car[.]" (J.A. at 92-93.) On redirect, Melia stated that he would never question a suspect in custody before he waived his *Miranda* rights, and added that he believed, "after reviewing these things," that he had Kellogg sign both forms before asking him any questions. (J.A. at 164.) Melia testified that Kellogg did not request an attorney or invoke his right to remain silent at any time during the interview at the FBI office.

Ruffin testified that he and Melia questioned Kellogg about the location of drugs and weapons in the duplex "because of safety[.]" (J.A. at 146.) He stated that he and Melia executed the *Miranda* rights waiver form after Kellogg signed the consent to search form and the search was conducted, though he could not recall whether Kellogg signed the waiver before they departed for the FBI office.

Following the hearing, the magistrate judge issued a report and recommendation denying Kellogg's motion to suppress. *United States v. Kellogg*, No. 05 Cr. 148, 2006 WL 3196902 (E.D.

Tenn. Nov. 1, 2006). The magistrate judge did not find Kellogg credible, rejecting his testimony that he was intoxicated when he signed the consent to search and *Miranda* waiver forms. *Id.* at \*6. The magistrate judge found that Kellogg had not received a *Miranda* warning prior to the agents asking for consent to search, but that Kellogg's rights were not violated at that time because the request to search was "not an interrogation." *Id.* at \*8. The magistrate judge found that whether Kellogg was informed of and waived his rights prior to dilvulging the location of contraband and other items in the duplex was unclear from the record, but that those statements were nevertheless admissible under the public safety exception established in *New York v. Quarles*, 467 U.S. 649, 656 (1984). *Id.* The magistrate judge found that Kellogg signed the *Miranda* waiver form prior to the questioning at the FBI office in Chattanooga. *Id.* at \*11. The magistrate judge's denial of the motion to suppress was subsequently adopted by the district court and Kellogg proceeded to trial on all three counts against him. *Id.* at \*1.

## III. Trial

Prior to Melia testifying at trial, the district court granted Kellogg's motion to exclude mention of Kellogg's alleged role in the Guntersville bank robbery, and to limit Melia to references that he was investigating Kellogg's role in "another crime." (J.A. at 199-200.) During his testimony, Melia recounted his interaction with Kellogg outside the duplex and Kellogg's statements regarding the location of the gun, drugs, drug paraphernalia and cash in the duplex. Melia also testified that at the FBI office in Chattanooga, Kellogg had "said that if I did forensic testing on the gun it would match the shot that was fired during the other crime I was investigating." (J.A. at 231-32.) Kellogg moved for a mistrial, arguing that Melia's testimony was unfairly prejudicial; the court denied the

6

motion. After other witnesses testified about the gun having been manufactured in Arkansas and about the drugs found at the residence, the government rested.

Kellogg testified in his own defense. He denied telling Melia outside the duplex about the location of contraband, stating that "I told [the agents] what I heard as far as the officers when they found [the items], but I did not tell him those things were mine, or that I had first-hand knowledge of those things, items." (J.A. at 379.) A little later, he stated that Melia "never questioned me about whether the gun was mine or not, all he wanted to do was wrap this up, and let's get gone." (J.A. at 379-80.) He explained the discrepancy between his account and Melia's by stating, "I'm not going to call Mr. Melia a liar, I respect his position, but what they are doing, they are stretching the truth." (J.A. at 379.) Kellogg testified that he knew better than to possess the illegal items that Melia was attributing to him:

> [L]adies and gentlemen, during those eight-and-a-half years that I done in prison, possession of a firearm, possession of cocaine, possession of any drug paraphernalia, or any weapon paraphernalia, even a bullet, possession of those items could amount to a term substantially because I'm a two time offender, this would be a third strike, so I did not want to put myself in a situation to go to prison for the rest of my life.

(J.A. at 381.) At the close of his direct testimony, Kellogg categorically denied all of the charges against him. Following a cross-examination wherein Kellogg continued to dispute Melia's account of events and deny ownership of the items found in the duplex, the defense rested.

After the jury was excused, the government proffered evidence regarding the Guntersville bank robbery, including the testimony of the FBI agent investigating the robbery, photographs of Kellogg at the robbery wearing clothing items found at the duplex, and the shoe print on the bank counter matching shoes found at the duplex. Kellogg objected to the government's evidence,

arguing that the government's photographic evidence could not be authenticated and that the evidence was unfairly prejudicial. In response, the government stated that it would call the bank teller working during the robbery to authenticate the photographs. The district court ruled that the proffered testimony and evidence was admissible. The court noted that Kellogg had created a credibility issue in claiming that he did not possess the firearm or make statements to that effect, and that the photographs were also relevant to the interstate nexus of the firearm. The court concluded that the evidence would not be unfairly prejudicial, and that Kellogg "by his own testimony has made the bank robbery evidence more critical to the government's case." (J.A. at 426-27.) The district judge stated he would give a limiting instruction to the jury that the bank robbery evidence should not be considered as evidence that the defendant is guilty of the crimes charged in this case.

Prior to the bank teller's testimony, Kellogg's counsel conducted a voir dire examination of her outside of the jury's presence. During voir dire, the bank teller testified that she did not see the man who robbed her in the courtroom, even though Kellogg was sitting in the courtroom at the time.

On direct examination, the bank teller testified that on October 4, 2005, while working at the Colonial Bank in Guntersville, she was held up at gunpoint by a "tall black man" of "medium complexion" wearing a striped shirt and New York Yankees baseball cap. (J.A. at 439, 452, 456.) She stated that the robber handed her a note, and she "looked up at his face[.]" (J.A. at 445.) She testified that when she told him she did not have the money in the front area where the tellers were, the robber threatened her and asked her if "she want[ed] to die." (J.A. at 454.) She testified that the robber's gun was "big and kind of squared off and dark in color." (J.A. at 447.) She stated that the robber stepped onto the bank counter and "fired the gun into the ceiling" because he got frustrated

with the amount of time it was taking her to give him money from the cash drawer, at which point she gave him the entire cash drawer. (J.A. at 446-47.) The government presented the teller with a number of photographs from the bank robbery, and she testified that the photographs accurately depicted the bank and the events she described in her testimony. When the prosecutor asked if one of the men in the photographs was the robber, she stated: "It is. And I do recognize the man. I'm sorry. He just, he had a hat on, but I do recognize the man. He's sitting at the table over there." (J.A. at 450.) On cross-examination, defense counsel challenged her regarding her prior inability to identify Kellogg as the bank robber; the teller responded that during voir dire she "wasn't really looking that closely." (J.A. at 459-60.)

Another government witness, the FBI agent who had investigated the bank robbery, then testified that the bank robber wore shoes that had "zig zag lines in the shoe print along with a circular honeycomb print," and that shoes found at the duplex were "consistent with what I saw of the print." (J.A. at 466-67.) He also testified that three days after the bank robbery, FBI agents found ammunition matching the gun fired in the robbery in a car in Guntersville that was registered in Kellogg's name.

The government recalled Melia, who testified that when he questioned Kellogg about the bank robbery at the FBI office, Kellogg said that he "did it" and used the robbery money to buy a car, among other things. (J.A. at 478.) Melia also testified that Kellogg admitted to wearing the New York Yankees baseball hat and the wristwatch that were found in the duplex while committing the robbery. Finally, he restated his prior testimony that Kellogg admitted the gun found at the duplex was the gun he used during the robbery.

At the close of evidence, Kellogg moved for an acquittal, and the court denied the motion. Kellogg timely appeals his conviction.

## DISCUSSION

I.       **Motion to Suppress**

   A.       **Standard of Review**

In reviewing a district court's suppression determination, we review findings of fact for clear error, and legal conclusions *de novo*. *United States v. Hudson*, 405 F.3d 425, 431 (6th Cir. 2005). Where a district court denies a motion to suppress, "we consider the evidence in the light most favorable to the government." *United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004) (en banc).

   B.       **Analysis**

"The Fifth Amendment guarantees that 'no person . . . shall be compelled in a criminal case to be a witness against himself.'" *New York v. Quarles*, 467 U.S. 649, 654 (1984). In *Miranda v. Arizona,* 384 U.S. 436 (1966), the Supreme Court extended the protection against compulsory self-incrimination to individuals in police custody. *Quarles,* 467 U.S. at 654. "As a general rule, when a defendant is in custody, law officials must give him appropriate *Miranda* warnings before interrogation begins; otherwise, any statements resulting from the police interrogation will be inadmissible unless the defendant clearly and intelligently waived his rights." *United States v. Clark*, 982 F.2d 965, 967-68 (6th Cir. 1993). Custody and interrogation are therefore the two "prerequisites to the triggering of Fifth Amendment privileges." *United States v. Latouf*, 132 F.3d 320, 330 (6th Cir. 1997). For a defendant's statements during a custodial interrogation to be admissible, the

government must demonstrate by a preponderance of the evidence that the defendant waived his *Miranda* rights prior to questioning. *United States v. Nichols*, 512 F.3d 789, 798 (6th Cir. 2008).

### 1.    Kellogg's Intoxication Claim

Kellogg contends that he was under the influence of Xanax at the time he was questioned by officers and that he therefore could not consent to a waiver of his rights at any point during his interaction with police, either in signing the consent to search form, or in signing his waiver of rights form on the way to Chattanooga. "Evidence that a defendant suffered, at the relevant time, from a condition or deficiency that impaired his cognitive or volitional capacity is never, by itself, sufficient to warrant the conclusion that his confession was involuntary for purposes of due process; some element of police coercion is always necessary." *United States v. Newman*, 889 F.2d 88, 94 (6th Cir. 1989). Kellogg has not presented evidence refuting the testimony of Melia and Ruffin–who both said that he was coherent and appropriately responsive–or evidence that Melia and Ruffin coerced him into waiving his rights at any point. Thus, the district court's rejection of Kellogg's intoxication claim was not clearly erroneous.

### 2.    Kellogg's Response to Consent to Search Request

Kellogg contends that, because Melia and Ruffin did not inform him of his *Miranda* rights prior to asking for his consent to search the duplex, his statement that anything illegal in the apartment was his, and that Huckabee should not be blamed, should have been suppressed.

"A suspect is in custody for purposes of receiving *Miranda* protection if there has been a 'formal arrest or restraint of movement.'" *Mason v. Mitchell*, 320 F.3d 604, 631 (6th Cir. 2003) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). It is undisputed that Kellogg was in

11

custody for purposes of the *Miranda* inquiry when Melia sought Kellogg's consent to search the duplex.

Interrogation is defined as "express questioning . . . [and] any words or actions on the part of police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). A simple request to search cannot be reasonably expected to elicit anything more than a "yes" or "no," and thus is not an interrogation. *United States v. Kellogg*, 202 F. App'x 96, 103 (6th Cir. 2006)[1]; *see also United States v. Glenna*, 878 F.2d 967, 971 (7th Cir. 1989) ("[A]lthough the district court believed that the officers' request for consent . . . was 'reasonably likely to evoke an incriminating response' and therefore ran afoul of *Miranda,* every federal circuit court that has addressed the question has reached the opposite conclusion.") (citation omitted) (collecting cases). Whether the agents "interrogated" Kellogg is an issue of fact this Court reviews for clear error. *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1512 (6th Cir. 1988).

After introducing himself and Ruffin to Kellogg, Melia immediately requested Kellogg's consent to search the duplex and asked Kellogg to sign the consent form. These requests did not constitute an "interrogation," because they were not "reasonably likely to elicit an incriminating response from [Kellogg]." *See Clark*, 982 F.2d at 968 (internal quotations and citation omitted). Rather, as the magistrate judge correctly observed, Melia should have reasonably expected a "yes" or "no" from Kellogg in response to those questions. *Kellogg*, 2006 WL 3196902, at *8. Accordingly, because the district court did not err in finding that Kellogg was not "interrogated" for

---

[1]The defendant in the cited case is not the defendant appealing this action.

purposes of *Miranda*, it properly denied Kellogg's motion to suppress his statement taking responsibility for anything illegal in the apartment.

### 3. Statements Confirming Contraband in Kellogg's Residence

Unlike his request for consent to search, Melia's questions to Kellogg regarding the existence and location of the gun used during the robbery and the cash box taken from the bank during the robbery constituted an interrogation. A reasonable officer would know that such questions were likely to elicit an incriminating response. *See Innis*, 446 U.S. at 301. Thus, consistent with the Fifth Amendment, officers were required to inform Kellogg of his constitutional rights and to obtain a waiver of those rights in order for the incriminating statements to be admitted at trial.

Melia and Ruffin both testified that they could not recall whether Kellogg signed the *Miranda* waiver form prior to their departure for Chattanooga. Moreover, the magistrate judge noted that, although Melia testified that he generally reads arrested suspects their *Miranda* rights before questioning them, he did not testify that he considered his questions regarding the location of contraband in the house to be "questioning." *Kellogg*, 2006 WL 3196902, at *8. Based on this record, the magistrate judge's finding that it was "*not* clear as to whether Kellogg was given a *Miranda* warning and waived his rights" prior to the interrogation was not clearly erroneous (emphasis supplied). Because the government has failed to demonstrate by the preponderance of the evidence that Kellogg waived his *Miranda* rights before this questioning began, *see Nichols*, 512 F.3d at 798, this Court finds that Kellogg's statements identifying the location of contraband and robbery evidence in the duplex must be suppressed, absent an applicable exception. *Clark*, 982 F.2d at 967-68.

As the magistrate judge noted, "there is a 'public safety' exception to the requirement that *Miranda* warnings be given before a suspect's answers may be admitted into evidence." *Quarles*, 467 U.S. at 655. The "public safety" exception applies to "a situation in which police officers ask questions reasonably prompted by a concern for public safety." *Id.* at 656. This Court evaluates the reasonableness of an officer's belief that either the public or law enforcement officers were in danger *de novo*. *United States v. Williams*, 483 F.3d 425, 428 (6th Cir. 2007).

In determining the applicability of the public safety exception, this Court considers factors including "the known history and characteristics of the suspect, the known facts and circumstances of the alleged crime, and the facts and circumstances confronted by the officer when he undertakes the arrest." *Id.* at 428. However,

> "[f]or an officer to have a reasonable belief that he [or the public] is in danger, at a minimum, he must have reason to believe (1) that the defendant might have (or recently have had) a weapon, and (2) that someone other than police might gain access to the weapon and inflict harm with it. The public safety exception is applied if and only if both of those two conditions are satisfied and no other context-specific evidence rebuts the inference that the officer reasonably could have perceived a threat to public safety."

*Id.* In *Williams*, where an arresting officer believed a gun to be in the defendant's room, this Court noted that "if one were to believe that [the defendant] was seated outside of his room and handcuffed when an officer questioned him . . . then the officers could not have had an objectively reasonable fear for their safety and the public safety exception would not apply." *Id.* at 429. *See also United States v. Brathwaite*, 458 F.3d 376, 382 n.8 (5th Cir. 2006) (rejecting application of public safety exception where police secured the suspect and his co-residents, conducted two security sweeps and gained control over the residence).

The public safety exception does not apply to the questioning of Kellogg about the contraband and robbery evidence in the duplex. The suspicion that Kellogg had recently committed a bank robbery at gunpoint was enough to satisfy the first prong of the *Williams* standard, i.e., that he might have had a weapon in the duplex. However, since the arresting officers had just ordered all of the occupants out of the duplex, handcuffed Kellogg and conducted a security sweep of the residence, there was no reason to believe that a weapon would be immediately accessible to individuals other than police. Thus, the immediate danger to the officers or the public was insufficient to justify the officers' failure to inform Kellogg of his rights prior to eliciting incriminating statements regarding the items in the duplex. *See Williams*, 483 F.3d at 429 (finding officer's knowledge of the violent crime defendant was alleged to have just committed insufficient to justify a belief that the officer or the public was in danger).

Moreover, in addition to asking Kellogg where the gun was, Melia also asked for the location of drugs and evidence from the bank robbery, neither of which could have been directed at alleviating the immediate danger of the situation. Certainly, those questions were "designed solely to elicit testimonial evidence from a suspect," *Quarles*, 467 U.S. at 658-59, and further undermine the government's argument that the officers acted out of safety concerns alone.

This Court therefore finds that Kellogg's statements concerning the location of contraband and bank robbery evidence in the duplex violated his Fifth Amendment rights, and the district court erred in denying Kellogg's motion to suppress those statements.

II.    **Evidence of Guntersville Bank Robbery**

    A.    **Standard of Review**

15

"A trial court's Rule 403 determination is reviewed for abuse of discretion." *United States v. Foster*, 376 F.3d 577, 592 (6th Cir. 2004). "A district court abuses its discretion when it applies the incorrect legal standard, misapplies the correct legal standard, or relies upon clearly erroneous findings of fact." *United States v. Pugh*, 405 F.3d 390, 397 (6th Cir. 2005) (citation and quotation marks omitted). This Court may reverse the district court's decision "only if [it is] firmly convinced that a mistake has been made." *Id.* This Court reviews the district court's exercise of discretion "in the light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect." *United States v. Zipkin*, 729 F.2d 384, 389 (6th Cir. 1984).

**B.    Analysis**

"Rule 403 governs whether evidence that is relevant under Federal Rule of Evidence 401 is admissible." *United States v. Caver*, 470 F.3d 220, 240 (6th Cir. 2006). "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. The district court has "very broad" discretion in weighing the evidence under Rule 403. *Caver*, 470 F.3d at 240. "The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997) (citation omitted). Unfair prejudice "refers to the evidence which tends to suggest [a] decision on an improper basis." *Caver*, 470 F.3d at 240. Such an improper basis is "commonly, though not necessarily, an emotional one." *Old Chief*, 519 U.S. at 180.

16

One factor in the "Rule 403 balancing is the availability of other means of proof, which would reduce the need for the potentially confusing evidence." *United States v. Merriweather*, 78 F.3d 1070, 1077 (6th Cir.1996). "Another consideration . . . is whether the 'reverberating clang'" of the prejudicial nature of the evidence will "drown [the] weaker sound" of the probative value of the evidence. *Id.* (quoting *Shepard v. United States*, 290 U.S. 96, 104 (1933)).

The district court initially determined that the only admissible testimony concerning the bank robbery was Melia's statement that he was called to the duplex because he was investigating Kellogg's role in "another crime." The government argues that Kellogg's testimony opened the door to the more detailed testimony on the bank robbery by challenging Melia's credibility and by putting his own credibility at issue. However, maximizing the probative value of the evidence of the bank robbery and minimizing its prejudicial nature, *see Zipkin*, 729 F.2d at 389, this Court believes the district court abused its discretion in allowing the government to present as much evidence of the robbery as it did.

As a preliminary matter, although the government contends the testimony of the bank teller and the FBI agent investigating the bank robbery were necessary to rebut Kellogg's testimony, the government introduced prejudicial testimony concerning the robbery before Kellogg even took the stand. During Melia's direct testimony, he stated that Kellogg had told him that forensic testing of the gun found at the duplex would match the shot "fired during the other crime I was investigating." This statement was highly prejudicial, as it informed the jury that Kellogg may have been involved in a recent shooting; the fact that a shot had been fired was of little to no probative value in proving that Kellogg possessed the gun in the duplex.

During his testimony, Kellogg accused Melia, in claiming that Kellogg admitted the gun and drugs were his, of "stretching the truth," and denied that Melia had ever questioned him about the gun. Certainly, the government was entitled to rebut that testimony by allowing Melia to testify as to some of the details of his interrogation of Kellogg in the FBI office that contradicted Kellogg's account.

However, the court went too far in allowing a lengthy narrative of the bank robbery to be presented at trial. The bank teller testified in great detail about the course of the robbery–including that the robber pointed a gun at her, threatened to kill her, and jumped onto the counter to force her to hand over the money. Moreover, the jury was presented with strong evidence that Kellogg was the bank robber: the teller, who had closely interacted with the bank robber, identified Kellogg as the robber; the FBI agent who had investigated the robbery testified that the robber's Yankees hat and wristwatch were found at the duplex, as were shoes matching a shoe print the robber had left on the bank counter; the FBI agent also testified that ammunition matching the shot fired during the robbery was found in Kellogg's car in Guntersville; and Melia testified that Kellogg confessed to the bank robbery at the FBI office. The unmistakable conclusion to draw from all of this testimony was that Kellogg, on trial for gun and drug possession, had menacingly robbed a bank at gunpoint just a few days earlier. While this evidence may have been somewhat probative as to whether the gun found at the duplex was Kellogg's and whether it had traveled in interstate commerce, it was unfairly prejudicial because of its "improper basis:" to convince the jury that Kellogg was a bank robber, on the loose and dangerous. *See Caver*, 470 F.3d at 240. In our view, the evidence of the bank robbery likely "drown[ed] [the] weaker sound" of Kellogg's gun possession, and could have led the jury to

convict him based on a crime for which he was not charged. *See Merriweather*, 78 F.3d at 1077; *Old Chief*, 519 U.S. at 180.

Further, the government presented plenty of other evidence proving Kellogg's possession of the gun–including its discovery at the duplex where he was staying and his statement to Melia at the FBI office that the gun was the same one fired during the other crime–and also presented unrebutted testimony that the gun had been manufactured in Arkansas. Thus, to the extent that the bank robbery evidence was admitted simply to rebut Kellogg's assertion that he did not possess the gun, or to prove that the gun had traveled in interstate commerce, it was largely unnecessary. *See Merriweather*, 78 F.3d at 1077.

"A limiting instruction will minimize to some degree the prejudicial nature of other criminal acts; it is not, however, a sure-fire panacea for the prejudice resulting from needless admission of such evidence." *United States v. Haywood*, 280 F.3d 715, 724 (6th Cir. 2002). Although the district court instructed the jury not to consider the bank robbery as evidence of Kellogg's guilt for the crimes charged, the sheer weight of the evidence that was introduced regarding the robbery would have likely undermined that instruction in the mind of a reasonable juror.

Accordingly, this Court finds that the district court abused its discretion in admitting so much evidence of the bank robbery. The district court must conduct a new trial to remedy its error.

**III.    Identification of Kellogg as Guntersville Bank Robber**

**A.    Standard of Review**

This Court reviews the admission of in-court identification testimony for abuse of discretion. *United States v. Hill*, 967 F.2d 226, 230 (6th Cir. 1992).

19

**B.      Analysis**

The introduction of an unreliable identification of a defendant obtained through impermissibly suggestive procedures violates the defendant's right to due process. *Moore v. Illinois*, 434 U.S. 220, 227 (1977). To determine whether identification evidence is admissible, this Court must first ask whether the "identification procedure was impermissibly suggestive." *United States v. Hill*, 967 F.2d 226, 230 (6th Cir. 1992). Should the identification procedure be found impermissibly suggestive, this Court must determine "whether, under the totality of the circumstances, the testimony was nevertheless reliable." *Id.* An analysis of five factors guides the reliability determination: (1) the witness' opportunity to view the suspect at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the suspect; (4) the level of certainty displayed by the witness during the confrontation; and (5) the length of time between the crime and the confrontation. *Neil v. Biggers*, 409 U.S. 188, 199 (1972); *see Hill*, 967 F.2d 226, 232 (applying *Bigger* factors to witness' in-court identification). "Against these factors is to be weighed the corrupting effect of the suggestive identification itself." *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977). However, "[a]s long as there is not a substantial likelihood of misidentification, it is the function of the jury to determine the ultimate weight to be given to the identification." *United States v. Causey*, 834 F.2d 1277, 1285 (6th Cir. 1987) (quotation marks and citations omitted).

The bank teller's in-court identification of Kellogg was not in response to any question from the prosecutor, who never asked her to identify the robber and had only asked her whether or not the bank robber was visible in one of the photos he was showing her. Accordingly, while the bank teller's sudden ability to identify the bank robber in the courtroom might raise a credibility issue, the

identification does not appear to have derived from any suggestive *procedure*, and therefore did not violate Kellogg's due process rights. *See Hill*, 967 F.2d at 230; *Causey*, 834 F.2d at 1286 ("The prior failure of the witness to identify the defendant goes only to the weight to be accorded testimony, not its admissibility.").

Moreover, even if the prosecutor's questioning of the bank teller could be considered suggestive, the identification seemed to be reliable enough that the district court did not abuse its discretion by allowing it. The bank teller, as the employee who had to listen and respond to the robber's demands, had ample opportunity to view the robber and pay close attention to him at the time of robbery. She testified that she "looked up at his face" when he handed her a robbery note, and exchanged several words with him before handing him the cash drawer. At trial, she demonstrated a detailed memory of the robbery before seeing the photos of the robbery scene, describing the robber's gun, his clothing and his movements in detail. While her prior description of the robber–that he was a tall black man with "medium complexion"–was somewhat vague, its accuracy had not been questioned. She did not express any doubt that Kellogg was the robber, repeating twice that she recognized him sitting in the courtroom. Therefore, although significant time had elapsed since the robbery, the other *Bigger* factors tend to support the reliability of the identification. The district court did not abuse its discretion in admitting the identification.

## CONCLUSION

For the foregoing reasons, we **REVERSE** in part and **AFFIRM** in part the judgment of the district court, and **REMAND** the case to the district court with instructions to provide Kellogg a new trial.

KETHLEDGE, Circuit Judge, dissenting. I respectfully disagree with the majority's conclusion that the district court's admission of evidence regarding Kellogg's involvement in a bank robbery requires a new trial in this case. The core issue at trial was whether the gun found at the duplex belonged to Kellogg. He took the stand to deny that fact, and to impugn generally the credibility of the government's lead witness, FBI Agent Melia. Having done so, it was fair game for the government to rebut Kellogg's testimony with proof that Kellogg used the same gun in a bank robbery only a few days before the gun was found. Virtually all of the evidence cited by the majority was admitted for precisely this purpose. That evidence did not merely show that Kellogg was a dangerous man; it instead all but certainly established that *the gun was his*. Which is to say, the evidence was highly relevant to the basic factual dispute in the case.

It is a tall order, then, for this court to say that the district court abused its discretion in admitting that evidence. That is particularly true given that—in an abundance of caution—the district court initially *excluded* most of the evidence now cited by the majority. That evidence only came in when Kellogg chose to throw down the gauntlet in his own testimony—again, concerning the basic factual dispute in the case. I do not think the government was required to sit on evidence that proved Kellogg wrong.

All that said, I recognize that this case is a close one. The government's evidence on rebuttal was more colorful than necessary to prove that Kellogg used the gun in the prior robbery. But on balance, I think the admission of the cited evidence fell within the discretion afforded the district court. I therefore respectfully dissent.